Henry W. **HENSLEY**, Appellant,

v.

**LUBBOCK NATIONAL BANK and Charles W. Craig dba Craig Motor Company, Appellees.**

No. 8828.

Court of Civil Appeals of Texas, Amarillo.

Jan. 9, 1978.

Walters & Associates ('A. Duane Neill), Lubbock, for appellant.

· Key, Carr, Evans & Fouts (Yvonne M. Faulks), Clifford, Sims & Kidd (Don R. Kidd), Lubbock, for appellees.

## ON MOTION FOR REHEARING

REYNOLDS, Justice.

We grant Lubbock National Bank's motion for rehearing, withdraw our 12 December 1977 opinion, set aside our judgment, and substitute this opinion.

An instructed verdict terminated a multiground action brought by a purchaser of two motor vehicles, which he bought for another who could not obtain credit, against the financing bank and the seller to recover statutory penalties for violations of two state and two federal enactments governing credit transactions. The evidence either fails to raise a material fact issue that the transaction did, or establishes that the transaction did not, come within the protection of the enactments. Affirmed.

Henry W. Hensley, formerly a used car salesman and presently in the bail bond business in Lubbock, gave a draft to assist Jim McManus in purchasing a 1968 Oldsmobile automobile. The draft was dishonored at the bank. Hensley prevailed upon Charles W. Craig, d/b/a Craig Motor Company, to honor the draft and finance the purchase through the motor company. McManus defaulted in the payments and Hensley repossessed the automobile, delivering it to the motor company.

Because he had involved Craig in the McManus transaction, Hensley told Craig that he would assist in disposing of the automobile. Hensley then "got into the deal with Tommy Hill to purchase" the 1968 Oldsmobile and a 1970 Ford pickup. According to Hensley, Hill needed a car for his wife, who sold Avon products, to drive and Hill used the pickup in laying carpet.

Hensley had, under his characterization, a business relationship and a friendship with Hill. Hill was a carpet layer who also owned a business named Business Reports Service. Hensley had committed himself to, and did, loan Hill $5,000 for the business. The authorized signatures for the bank account of Business Reports Service were Hensley's and Hill's. Hensley's daughter worked for Hill in the business.

When Craig would not accept the credit of Hill, Hensley signed the instrument, which Craig prepared and upon which Hensley bases his actions, for the purchase of the two vehicles. The instrument, which Hensley admittedly did not read and which was like a "bunch" Hensley had filled out in the past, provided that the deferred payment price was payable in eighteen equal installments.

Hensley testified that he was going to get nothing out of the transaction, and that his purpose in signing the instrument "was just trying to help Tommy Hill out." His testimony is that "I signed a contract where it was sold to Tommy Hill;" that he was, and Craig knew he was, purchasing the vehicles for Hill; that Hill, and not Hensley, was to make the payments; and that, when the vehicles were paid for, Hensley was going to assign the titles to Hill. In elaboration, Hensley was asked and answered as follows:

Q In any event at the time that deal was made for Tommy Hill, Mr. Hensley, you weren't going to use that car for your own use were you, either one of them?

A Neither one of them.

Q And you had no intentions of driving either car yourself?

A No.

Q It was not for your personal use, nor for your household use, nor for any agricultural purposes was it?

A No, it wasn't.

* * * * * *

Q What you intended to do in getting involved with Tommy Hill on the thing, you intended to buy the cars and then when they were paid for you were going to transfer the titles over to him?

A Correct.

Q So you were buying the cars to be resold to Tommy Hill?

A I wasn't making any profit off of it if that's what you mean.

Q I'm not saying you was going to make a profit, but that's what you was going to do. You was going to buy it and then resell it to Tommy Hill.

A I was going to assign the titles to him, correct.

Q And that's what you intended to do when you make the deal?

A Correct.

* * * * * *

Q Now let's talk about what your performance was. You considered this to be Tommy Hill's car, didn't you, and his pickup?

A Yes, I did.

* * * * * *

Q So there is no question that these cars weren't bought for your use?

A No, they wasn't.

* * * * * *

Q Because the cars were actually bought for that business [Business Reports Service]. Is that what you are telling me?

A No. The cars were actually bought by Tommy Hill.

The instrument Hensley signed was assigned to the Lubbock National Bank. Of the eighteen installments, Hill paid only four, three of which were paid after Hensley loaned Hill the money to pay them.

The loans were included in the $5,000 Hensley loaned Hill. Repossession of the motor vehicles was agreed upon by Hill, Hensley and Craig. Hill took the pickup to the motor company; Hensley got the automobile and delivered it. Hensley thought Craig would sell the vehicles "and we was going to come out on them."

Thereafter in Lubbock National Bank's suit against Hensley for a balance claimed due on the purchase price of the vehicles, Hensley asserted actions against both the bank and Craig. He alleged that the bank and Craig had violated the provisions of, and were therefore liable to him for the statutory penalties provided in, the Texas Consumer Credit Code, Texas Revised Civil Statutes Annotated, Article 5069–7.01, et seq., and the federal Consumer Credit Protection Act, generally known as the Truth-in-Lending Act, 15 U.S.C.A., Section 1601, et seq. Additionally, Hensley alleged that the bank failed to give him notice that the repossessed pickup would be sold as required by the Texas Uniform Commercial Code, V.T.C.A., Bus. & C. § 9.504(c) (Supp. 1976–77); that Craig violated the odometer requirements of the federal Motor Vehicle Information and Cost Savings Act, 15 U.S.C.A., Section 1901, et seq.; and that each was liable for the statutory penalty provided for the violation each committed.*

After the repossessed vehicles were sold, the bank nonsuited its cause, and the parties were realigned with Hensley as plaintiff. To make a submissible case for each of his actions, Hensley presented his testimony and that of Craig as an adverse witness, together with the written instrument of the transaction.

Following the presentation of Hensley's evidence, the bank and Craig moved for instructed verdicts against Hensley. The grounds common to both motions were that the proof shows as a matter of law that Hensley was not a "retail buyer" or "buyer" under the Texas Consumer Credit Code or a

---

* Craig cross-actioned against Hensley for damages arising out of the transaction. In disposing of the causes, the trial court also instructed a verdict in favor of Craig, but later granted a new trial and severed Craig's cross-action. That cross-action is not involved in this appeal.

"consumer" within the meaning of the federal Truth-in-Lending Act. The bank's motion further asserted that notice to Hensley of the intended sale of the pickup was established as a matter of law and, in any event, Hensley had produced no evidence of any loss, while Craig's motion included the ground that Hensley failed to prove a prima facie case of violation of the federal odometer provisions.

The court, finding "that no disputed fact issue exists in this cause," withdrew the case from the jury and decreed that Hensley take nothing. Hensley has appealed from the take-nothing judgment.

Because the court can instruct a verdict if there are no fact issues raised by the evidence, *In re Price's Estate*, 375 S.W.2d 900, 904 (Tex.1964), Hensley recognizes that he must assume the appellate burden of showing that the peremptory instruction cannot be supported on the grounds set out in the motions. *McKelvy v. Barber*, 381 S.W.2d 59, 62 (Tex.1964). In this regard, Hensley contends that he introduced evidence that he was a person to whom the enactments apply and that the instrument he signed failed to meet the requirements of those enactments.

In view of the instructed verdict, any evidence supporting Hensley's position must be accepted as true and all conflicts and inconsistencies must be resolved in his favor, *Adams v. Slattery*, 156 Tex. 433, 295 S.W.2d 859, 865 (1956), as well as every inference that may properly be drawn from the evidence. *Echols v. Wells*, 510 S.W.2d 916, 919 (Tex.1974). Notwithstanding, an instructed verdict is correct if there is no evidence to prove a necessary part of plaintiff's case. *Glenn v. Prestegord*, 456 S.W.2d 901, 902 (Tex.1970). Moreover, if a litigant unqualifiedly admits positive and definite facts which, if true, defeats his cause of action, he is bound by his admissions and cannot successfully complain if the court directs a verdict against him. *Stanolind Oil & Gas Co. v. State*, 136 Tex. 5, 133 S.W.2d 767, 145 S.W.2d 569, 570 (1940). *Accord, Griffin v. Superior Insurance Company*, 161 Tex. 195, 338 S.W.2d 415, 418–19 (1960).

*Texas Consumer Credit Code*

To bring himself within the protection of Chapter 7 of the Texas Consumer Credit Code, which relates to motor vehicle installment sales, Hensley was required to produce evidence that he was a retail buyer or buyer. Vernon's Ann.Civ.St. art. 5069–7.01(b) specifies that:

"Retail Buyer" or "Buyer" means a person who agrees to buy or buys a motor vehicle *other than principally for the purpose of resale*, from a retail seller in a retail installment transaction. (Emphasis added.)

Hensley's declaration that his purpose in entering into the transaction was to help Hill out is clarified by his testimony establishing that the true purpose of the transaction was to effect a sale of the motor vehicles to Hill, who could not secure credit to purchase them in his own name. The method employed was a sale to Hensley with the understanding that the vehicles actually were bought by Hill, who could become the owner only through a resale by, or a gift from, Hensley. There is no testimony or inference of an intended gift. Instead, Hensley's testimony is that Hill, not Hensley, used the motor vehicles; Hill, not Hensley, was to make the payments; and when Hill made the payments, Hensley was to transfer the titles to Hill in order to achieve the object of the primary transaction which, in law, would consummate a resale. It, therefore, is inescapable that Hensley, who did not even read the instrument he signed, bought the vehicles principally for the purpose of resale to Hill and, thereby, he was not a "retail buyer" or a "buyer" within the meaning of Chapter 7 of the Texas Consumer Credit Code. Thus, the instructed verdict was proper on this phase of Hensley's action.

*Federal Consumer Credit Protection Act*

Whether there is evidence that Hensley entered into a consumer credit transaction within the ambit of the federal Consumer Credit Protection Act must be

determined by subjecting the evidence favorable to Hensley to the definition in 15 U.S.C.A. § 1602(h) reading:

> The adjective "consumer", used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, household, or agricultural purposes.

Hensley only contends that he purchased the vehicles for the personal purpose of helping a friend. In this connection, we must ignore Craig's testimony of Hensley's statement to the legal effect that the vehicles were needed for business purposes which, by virtue of Section 1603, would exempt the transaction from the Act's application.

One of the statutory requirements for a consumer credit transaction is that, as material here, *the property which is the subject of the transaction is primarily for personal purposes.* In *Redhouse v. Quality Ford Sales, Inc.,* 511 F.2d 230, 234 (10th Cir. 1975), *rehearing* 523 F.2d 1, the purpose of the vehicle which was the subject of the transaction was tested by the use made of it; the same equation was made in both the concurring opinion at 239 and in the dissenting opinion at 240. By that test, Hensley's testimony is conclusive that the vehicles which were the subject of the transaction were not for Hensley's personal use, and the transaction would not come within the Act. Beyond that, even though Hensley's motive in entering into the transaction was personal, his own testimony establishes that the purpose for purchasing the vehicles themselves was not personal to him, but it primarily was to vest their ownership in Hill. Under these circumstances, the transaction did not qualify as a federal consumer credit transaction, and the instructed verdict was proper on this aspect of Hensley's cause.

### Federal Motor Vehicle and Cost Savings Act

 Hensley pleaded that Craig failed to disclose the odometer mileage readings to him in writing, thereby incurring civil liability set forth in 15 U.S.C.A. § 1989. The instrument Hensley signed has a line drawn through the space for entry of an odometer reading. Craig testified, but Hensley denied, that he gave Hensley a separate written document certifying to the odometer mileage on both vehicles. Thus, there was a fact issue whether Craig violated 15 U.S.C.A. § 1988(a)(1) requiring any transferor to give written disclosure of the cumulative mileage registered on the odometer to the transferee in connection with the transfer of ownership of a motor vehicle.

While the failure to disclose is a violation of Section 1988, *Delay v. Hearn Ford,* 373 F.Supp. 791, 795 (D.S.C.1974), the statutory remedies for that violation apply only if the violation is "with intent to defraud." Section 1989(a). As a result, there is no cause of action for statutory penalties for mere negligence or even a knowing violation unless there is evidence of an intent to defraud. *Pepp v. Superior Pontiac GMC, Inc.,* 412 F.Supp. 1053, 1054 (E.D.La.1976).

Hensley's testimony is that he did not pick out the vehicles, he did not look for a speedometer reading, so far as he knew Craig did not tamper with the odometer readings, and that it probably would not have made any difference if the mileage had been disclosed. No inconsistency is shown by the testimony of Craig, who testified that he did not tamper with the odometer readings.

Even if Craig failed to disclose the mileage, there is neither testimony nor a factual basis for the inference that Craig's failure was with the intent to defraud. Consequently, Hensley has produced no evidence of entitlement to damages under 15 U.S.C.A. § 1989(a). *Birdwell v. Hartsville Motors, Inc.,* 404 F.Supp. 625, 629 (M.D.Tenn. 1975). It follows that the instructed verdict was proper on this part of Hensley's action.

### Texas Uniform Commercial Code

 The remaining portion of Hensley's action stems from his allegation that

the bank failed to give him notice that the pickup would be sold after a reasonable time. Hensley further alleges that the failure was a violation of the Texas Uniform Commercial Code for which he is entitled to the prescribed statutory penalty.

V.T.C.A.Bus. & C. § 9.504(c) (Supp.1976–77) provides that disposition of the collateral may be by public or private proceedings; and that, except in situations not applicable here, "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor . . ." If the proceeding is not in accordance with the Code's provisions, Section 9.507(a) (Supp.1976–77) prescribes the measures of recovery.

Admitted into evidence, without proof of mailing and over Hensley's objection for the lack of a proper predicate, was the bank's copy of its letter addressed to Hensley and advising that, unless reclaimed in ten days, the pickup will be sold. Attached to the copy was a numbered receipt for certified mail showing the name of and the address for Hensley. Also introduced was a return receipt carrying the same certified mail number, marked "DELIVER ONLY TO ADDRESSEE," and bearing the signature "Tom Hensley" in the space for designation of "ARTICLE ADDRESSED TO." There is no other addressee shown on the return receipt and no signature appears on the line provided to indicate receipt of the article delivered. Hensley identified the signature "Tom Hensley" as that of his son, but he denied that he had received the bank's letter or any notice from the bank that either vehicle would be sold.

The bank argues that despite Hensley's denial, the signed return receipt is conclusive that the letter was mailed and, therefore, Hensley received notice required by Section 1.201(26), which reads:

(26) A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when

(A) it comes to his attention; or

(B) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

The argument is not persuasive in the absence of any proof to connect the letter addressed to Hensley with the certified article receipted for by Tom Hensley. The receipt for certified mail attached to the copy does not fill the void, for there is no evidence concerning the attachment. Under these circumstances, Hensley's sworn denial of any notification constitutes some proof of non-notification. *Sudduth v. Commonwealth County Mutual Insurance Company*, 454 S.W.2d 196, 197–98 (Tex.1970). Unresolved, then, is the material fact issue concerning notification.

If the fact issue concerning notification is resolved in favor of Hensley, the question becomes whether Hensley has shown a right to the specific statutory penalty for which he pleaded or the evidence warranted an issue on a loss caused Hensley because of his non-notification. As applicable here, Section 9.507(a) (Supp.1976–77) states:

If it is established that the secured party is not proceeding in accordance with the provisions of this subchapter disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor . . . has a right to recover from the secured party *any loss caused by a failure to comply with the provisions of this subchapter. If the collateral is consumer goods*, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus ten per cent of the cash price. (Emphasis added.)

Hensley neither contends nor points to any evidence, and we have not found any probative evidence in the record, that he suffered any identifiable loss caused by a failure to notify him of the disposition of

the pickup. Rather, Hensley pleads only that the non-notification entitles him to the penalty calculable under the statutory standards.

The penalty sum imposed for non-notification applies, by force of the statute itself, only if the collateral is consumer goods. Consumer goods are, by the Section 9.109(1) (Supp.1976–77) definition, goods "used or bought for use primarily for personal, family or household purposes." Earlier noted was that Hensley does not contend that the pickup was bought for family or household purposes, and we previously determined that the pickup was not bought primarily for a personal purpose within the contemplation of a credit transaction.

A civil action for damages will not lie unless some damages are proven. *Matrix Computing, Inc. v. Davis*, 554 S.W.2d 288, 290 (Tex.Civ.App.—Amarillo 1977, no writ). Thus, there being no evidence that non-notification caused Hensley an actual loss, and it being established that the pickup was not consumer goods to which the statutory penalty applies, a necessary part of Hensley's action failed, and the instructed verdict on this ground of the action was correct. *Glenn v. Prestegord, supra,* at 902.

The judgment is affirmed at Hensley's cost.