Santos **BELTRAN**, Appellant,

v.

**GROOS BANK, N.A.**, Appellee.

No. 04–87–00189–CV.

Court of Appeals of Texas, San Antonio.

Aug. 10, 1988.

Gary A. Scarzafava, San Antonio, for appellant.

S. Mark Murray, Murray & Moore, San Antonio, for appellee.

Before BUTTS, CANTU and REEVES, JJ.

## OPINION

CANTU, Justice.

This appeal concerns whether appellant, Beltran, should be held liable on a letter of guaranty which he gave to appellee, Groos Bank. Appellee, the Bank, made at least two loans to Do Yon Yi and Sun Un Yi, secured by "all equipment, furniture, and equipment now owned or hereafter acquired and all proceeds thereof" owned by the Yis in their restaurant business. Only one note, loan number 9001, dated June 3, 1985, in the principal amount of $12,634.87 is the subject of this appeal.

It is undisputed that Beltran signed a letter of guaranty in the amount of $13,-000.00 covering this note. Beltran had no interest in the restaurant for which the loan was made, nor relationship to the debtors, other than his being their attorney. The terms of the guaranty agreement limited Beltran's liability to $13,000.00, plus in-

terest, collection costs, and 15% of the indebtedness for attorneys' fees.

The Yis defaulted on the note and the bank brought suit to foreclose on the collateral and recover any deficiency. The bank alleged that appellant was liable for the full amount of his letter of guaranty, $13,000.00. Appellant filed a general denial and alleged several affirmative defenses.

Trial was before the court, and the court entered judgment for the bank against appellant for the full amount of the letter of guaranty. We affirm.

Appellant raises thirteen points of error and appellee raises one cross point of error.

The points of error in each case challenge the sufficiency of the evidence, both factually and legally to support applicable findings of the trial court. We review the contentions under the well recognized rules.

When reviewing a "no evidence" complaint, the appellate court must consider only the evidence and inferences therefrom that tend to support the findings and disregard any evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

When considering factual insufficiency questions we must view the entire record in the light most favorable to the finding of the trier of fact. The finding in each instance will prevail unless such review reveals either that no probative evidence supports it or that it is so against the great weight as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

## I. NOTICE

Appellant's first four points of error concern whether proper notice was given to him prior to disposition of some of the collateral, as required by the Texas Business & Commerce Code. *See* TEX.BUS. & COMM.CODE ANN § 9.504(c) (Vernon Supp.1988). Appellant does not dispute that he discussed the possible sale of collateral with a representative of the bank, but he contends that § 9.504(c) requires written notice of the sale.

The Dallas Court of Appeals addressed this very issue in *MBank Dallas N.A. v. Sunbelt Mfg., Inc.*, 710 S.W.2d 633, 635–36 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). That court held that the statute does not specifically require written notice, and therefore, the notice need not be written as long as it is reasonable. The important consideration is not whether the notice is written or oral, but whether it was reasonable and whether it was received within the prescribed time period. *See id; see also* TEX.BUS. & COMM.CODE ANN. § 1.201(38) (Vernon 1968) (receipt of any timely notice has effect of proper sending); *Crest Investment Trust, Inc. v. Alatzas,* 264 Md. 571, 287 A.2d 261, 264 (1972).

■ Appellant urges that the Dallas Court erred in its holding in *MBank Dallas, supra,* and he cites to a decision from the Amarillo Court of Appeals, *Hensley v. Lubbock National Bank,* 561 S.W.2d 885, 891 (Tex.Civ.App.—Amarillo 1978, no writ). We interpret the *Hensley* case to stand merely for the proposition that a sworn denial of receipt of notice is some evidence of non-notification of a sale. *See id.* We find no conflict between the *Hensley* case and the *MBank Dallas* case, and we believe the *MBank Dallas* case to be directly on point with the issue at hand. The trial court may consistently consider both evidence of oral notice and evidence of a sworn denial of receipt of notice.

■ We agree with the Dallas Court that written notice is not required if appellant received reasonable notice within the time period allotted. *MBank Dallas, supra.* Appellant testified at trial as follows:

Q: He [Mr. Roberts, the bank representative] did talk to you about that, that the bank wanted to find somebody who would buy that restaurant, didn't he?

A: Uh-huh.

Q: In fact, he talked to you specifically about some people who might be interested in that, didn't he?

A: A mexican restaurant, yeah.

Q: And you and he talked about how much deficiency you would be liable for if they did buy that, didn't you?

A: He told me he was trying to sell it for the entire amount.

Q: You never talked about how much deficiency you might have with the sale price of that restaurant, on that or any other offers?

A: No. He was talking about extinguishing the note with the sale of the —to whomever he sold it to.

\* \* \* \* \* \*

Q: Well, why was he talking to you about for the entire amount and extinguishing your liability on the note?

A: He wanted me to find somebody to take the business over. Did I have any partners or know anybody?

Q: Did you?

A: No.

Q: Well, what was he talking to you about? How much money that would keep you from having to pay the bank?

A: He mentioned something about that.

\* \* \* \* \* \*

Q: Well, y'all discussed on several occasions the hope of Randy Roberts and in seeking your help of selling this business as an ongoing operation, didn't you?

A: Yeah.

\* \* \* \* \* \*

Q: Didn't that strike you as a little odd that the bank was trying to sell that restaurant?

A: I think maybe Randy did mention something about a business broker or he knew someone in the restaurant business.

Q: Didn't that strike you as a little odd that the bank was trying to sell that business?

A: It didn't strike me as being odd.

\* \* \* \* \* \*

Q: And what you understood the bank was trying to do was to sell that restaurant for enough money to pay off the debt that was owed at the bank; isn't that right?

A: That's correct; yeah.

Q: Now, you said you went by on several occasions and looked in the windows of that restaurant; is that right?

A: Uh-huh.

Q: When did you stop doing that?

A: About July of 1986.

Q: Well, that stuff wasn't in there in July of 1986, Mr. Beltran.

A: That's correct. That's correct.

Mr. Roberts, appellees' representative, testified at trial as follows:

Q. ... did you give notice, oral or written, to Mr. Beltran of the repossession and sale of collateral which served to secure the indebtedness of the Yis prior to the time that it was repossessed and sold.

A: Yes, I did.

Q: And how did you do that?

A: Sam and I talked several times about the possibility of selling the restaurant as an ongoing entity or as piecing out the equipment just piece-by-piece selling them.

Q: And did you tell him where—once it was finally picked up and removed from the Lai Lai restaurant, did you tell him where it was?

A: Yes, I did.

Q: Prior to the time any of it was sold.

A: Yes.

\* \* \* \* \* \*

Q: ... was there other notice given to Mr. Beltran prior to the repossession and disposition of this collateral?

A: We talked several times about repossessing the collateral.

Q: Ok. Did he know that, as a result of your conversations where it was and when it was going to be disposed of?

A: I believe he understood exactly the situation.

A letter was admitted at trial addressed to appellant from appellee, dated August 26, 1986, which stated:

The equipment from the Lai Lai Restaurant has been repossessed by the bank and is being warehoused at the business location of Levinson Restaurant Supply Co.

Should you or any of your contacts wish to purchase any of the equipment, please contact Bob Gernsbacher at Levinson Restaurant Supply Co.

We find that appellant received "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or intended disposition is to be made." TEX. BUS. & COMM.CODE ANN. § 9.504(c). Appellant's first point of error is overruled.

Although appellant received oral notice of the sale of the collateral, he claims that notice was insufficient due to a failure to inform him of the type of sale and when it would occur. The creditor is required to give the debtor reasonable notice of (a) the time and place of any public sale, or (b) the time after which any private sale or other disposition will be made; unless the collateral is of a type customarily sold on a recognized market. TEX.BUS. & COMM. CODE ANN. § 9.504(c).

Appellant's point is without merit because the evidence shows he had actual knowledge of the type of sale. He knew a business broker had been hired to sell the restaurant as an ongoing business, but had been unable to sell it. Mr. Roberts from the bank had specifically inquired of appellant if he knew of anyone who might want to buy the business.

On August 26, 1986, the bank sent a certified letter to appellant informing him that the restaurant equipment had been repossessed, that it was being warehoused at a specific location, and informing appellant who to contact if he or any of his contacts wished to buy the collateral. Mr. Roberts from the bank testified that appellant understood exactly the situation and knew where the collateral was and when it was going to be disposed of.

The purpose of giving notice to the debtor of an intended sale of collateral, is to allow the debtor to either bid on the collateral himself, or insure that the sale is a commercially reasonable one. Appellant, the record shows, was given opportunity to bid on the collateral and was told who was handling the sale.

Clearly there was sufficient evidence for the trial court to find that appellant knew of the intended disposition of the collateral. Appellants first four points of error are overruled.

## II. CONSIDERATION

Appellant's fifth point of error complains of a lack of consideration for the letter of guaranty. The letter of guaranty recites that the consideration was to be $1.00 and credit given or to be given to Sam Beltran. The letter was executed at the bottom by appellant and was notarized. At trial, appellant testified that he never received the "money" that was to be paid to him. However, there was no testimony that appellant was refused credit by the bank.

The Second Restatement of Contracts, § 88 states:

## GUARANTY

A promise to be surety for the performance of a contractual obligation, made to obligee, is binding if

(a) the promise is in writing and signed by the promisor and recites purported consideration; or

(b) the promise is made binding by statute; or

(c) the promisor should reasonably expect the promise to induce action or forbearance of a substantial character on the part of the promisee or a third person, and the promise does induce such action or forbearance.

Comment D under Section 88 states in part:

Like Section 87 on option contracts, this section ... precludes inquiry into the question whether the consideration recited in a written contract of guaranty was a mere formality or pretense, or whether it was in fact given.

■ Clearly, under the restatement rule, appellant's point cannot be sustained. The guaranty agreement was in writing and signed by appellant. The agreement recites purported consideration. Further, we find, according to Section 88(c), that appellant should reasonably have expected that his signature on the letter of guaranty would induce the bank to lend money to the Yis. There is evidence that his signature in fact did induce the loan. Mr. Roberts, a bank officer, testified that the bank would not have made the loan to the Yis without appellant's guarantee.

"... It is not necessary that consideration for the guarantee pass to the guarantor, ... for it is sufficient consideration if the primary debtor receives some benefit." *Hargis v. Radio Corp. of America, Electronic Components*, 539 S.W.2d 230, 232 (Tex.Civ.App.—Austin, 1976, no writ.). Appellant's fifth point of error is overruled.

## III. COMMERCIALLY REASONABLE SALE

Appellant's sixth, seventh, and eighth points of error concern the commercial reasonableness of the sale of collateral. Appellant argues that there was no evidence or that the evidence is insufficient to show that appellee disposed of the collateral in a commercially reasonable manner.

■ Appellant has failed to preserve error on this point. Appellant failed to raise commercial reasonableness in his pleadings, in his testimony, or at any time during trial. It is raised for the first time on appeal.

The trial court found in its conclusions of law that the bank disposed of the collateral in a commercially reasonable manner. There is no evidence in the record before us that appellant took issue with that conclusion.

■ Moreover, we find ample evidence that the sale was conducted in a commercially reasonable manner. Mr. Roberts, appellees' representative, described the manner of the sale. According to Roberts, the bank attempted to sell the restaurant as an ongoing business through a business broker, and then when the landlord required the business to be vacated, the bank moved the collateral to a large, established restaurant supply company that handles liquidations. In fact, the record is completely devoid of any evidence that the sale was anything but commercially reasonable.

Appellant's sixth, seventh, and eighth points of error are overruled.

## IV. PROPER OFFSETS

Appellant's points of error nine, ten, and eleven complain that there is no evidence or that the evidence is insufficient to show that proper offsets were made giving credit, following the sale of the collateral, to appellant's liability. Conclusion of law No. 6 recites that the bank gave all proper offsets for the attachment and sale of the collateral.

The undisputed evidence at trial was that the Yis, as primary debtors, were indebted to the bank on two notes, which were cross-collateralized so that the restaurant and its equipment were collateral for another note as well as for the one appellant guaranteed.

The evidence at trial produced a payment chart listing all payments made by the Yis on loans from the bank which was admitted without objection. The payment chart is not in the record before us. We must presume it is favorable to appellee and supports the court's finding of fact number 10 that the balance due on the note is $14,587.22.

Lists of all of the collateral were admitted at trial. Mr. Roberts testified about the offset, as follows:

Q: Can you tell the court what—how much you sold the collateral for?

A: We have not sold all of the collateral yet. We have sold some of the collateral, and we have netted $7,488.00 after the charges for clean-up and for Mr. Gernesbacher's commission and for his picking the collateral up originally.

\* \* \* \* \* \*

A: The proceeds have been applied to the larger note.

\* \* \* \* \* \*

Q: And, how much was the larger note?

A: At the time it was totally charged off, the remaining balance was $74,-743.75.

The guaranty agreement and the security agreement provided that the bank could apply all the collateral to the larger note and look to appellant as the source of satisfaction on the guaranteed note.

The letter of guaranty provided that the guarantor:

Hereby guarantees to the bank ... the prompt payment at maturity of any and all indebtedness that is now, or at any time may be or become, owing to the bank ... not exceeding in the aggregate principal amount at any one time Thirteen Thousand and no/100 dollars, together with any and all interest and reasonable costs of collection, including 15% of the said indebtedness then owing as attorney's fees should this contract be placed in the hands of attorneys for collection or should it be collected through any court; ...

If the indebtedness of the borrower to the bank ... should at any time exceed the amount here and above mentioned, the bank ... shall be at liberty to apply to so much of said indebtedness as shall exceed said amount, ... and any security or pledge which the bank may hold to secure any indebtedness owing it, ... by the borrower, ... *it being the intention to give the bank the right to apply any such ... security ... to the extinguishment of the borrower's indebtedness not hereby guaranteed, before making application thereof to indebtedness for which the guarantor shall be liable hereunder.*

Whenever any indebtedness, or any renewal thereof guaranteed hereunder, shall become due and remain unpaid, the guarantors, will, on demand ... pay the amount due thereon to the bank ..., *and it shall not be necessary for the bank, in order to enforce such payment by the guarantors, ... to enforce its rights against any security which shall have been given the bank to secure such indebtedness.* (emphasis added).

■ This guaranty agreement was signed by appellant and admitted at trial without objection. The trial court found that this agreement was not ambiguous.

It follows that under the terms of the agreement, the bank had the right to apply all of the proceeds from the collateral to the larger note before applying any collateral proceeds to the note which appellant guaranteed.

We find ample evidence that the bank elected to apply the collateral solely to the larger note, as the bank was entitled to do, leaving the letter of guaranty as the sole security for the smaller note. There was also evidence of the principal balance owed to the bank on that smaller note, taking into account any credit for payments made by the Yis. Appellant raised no issue at trial regarding the possibility of any other offset that might have been unaccounted for. Although there is some suggestion that the total value of the collateral might have exceeded the amount owed on the larger note, thereby giving appellant a right to some offset, we must presume that the missing payment chart provided evidence to support the trial court's findings that all proper offsets had been given. Appellant's ninth, tenth, and eleventh points of error are overruled.

## V. SUBROGATION

Appellant's twelfth point of error is that the trial court erred in finding that appellant is not entitled to be subrogated to the position of the bank nor to take possession, nor receive the reasonable value for the collateral. Since we have found that the bank was entitled to apply the collateral entirely to the larger note, eliminating the possibility of collateral being applied to the note appellant guaranteed, logic dictates that appellant has no right to the collateral in any form. We find no evidence whatsoever that appellant had any right to possess the collateral. Appellant's twelfth point of error is overruled.

## VI. CUMULATIVE POINT

Appellant's thirteenth point of error is a general statement that "the district court erred in finding that Santos Beltran is liable to Groos Bank, N.A. in the amount of thirteen thousand dollars." This broad point of error is not specific enough to direct this court to any alleged error by the trial court other than that already considered. TEX.R.APP.P. 74(d) (Point should direct attention of appellate court to error about which complaint is made). Appellant has not presented any argument to support this point of error in his brief other than the arguments in the other points of error which we have previously addressed. This point is therefore merely cumulative. *See* TEX.R.APP.P. 74(f) (repetition or prolixity of statement or argument must be avoided). Appellant's final point of error is overruled.

## VII. ATTORNEY'S FEES

Appellee presents one cross-point of error, complaining that the trial court erred in concluding as a matter of law that appellee's right to recover attorneys fees is limited to the terms of the letter of guaranty which provided for attorneys fees of 15% of the indebtedness owing under the guaranty.

The trial court found in its findings of fact no. 11 that reasonable attorneys fees in this case would be $7,500.00. We agree that there was sufficient evidence to support this finding of fact. However, the trial court concluded as a matter of law that the guaranty agreement limited attorney's fees to $1,950.00, which is 15% of the indebtedness owing on the letter of guaranty.

Appellee's argument is that the trial court should ignore the contractual amount of attorney's fees whenever there is sufficient evidence that a different amount would be reasonable. The only case appellant cites in support of this position is *Hernandez Constr. & Supply Co., Inc. v. National Bank of Commerce of Brownsville*, 578 S.W.2d 675, 676–77 (Tex.1979). The *Hernandez* case can be easily distinguished. *Hernandez* stands for the proposition that the holder of a note may not collect the amount of attorney's fees specified in the contract if the contractual amount is greater than what the evidence shows is reasonable. Appellee argues that the converse should also be true, i.e. the contractual amount should be disregarded

if it is shown by the evidence to be less than a reasonable amount. We disagree. Appellee has cited no cases in support of his converse argument, and our independent research has revealed none.

We refuse to treat the contractual language as meaningless. Courts have found in the past that as a policy matter attorneys should not be allowed to collect a higher than reasonable fee. Unreasonable attorneys fees is an affirmative defense. *See Hernandez Constr. supra* at 677; *see also Gardner v. Associates Inv. Co.*, 171 S.W.2d 381, 384 (Tex.Civ.App.—Amarillo 1943, writ ref'd w.o.m.). However, there is no such policy consideration preventing an attorney from agreeing to accept a lower than reasonable fee. Parties to contracts may and usually do agree to limit their liability in this way.

Appellees cross-point of error is overruled.

Having viewed each contention under the appropriate rule above stated, all points of error are overruled. We affirm the judgment of the trial court.