

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00765-CV

**CR TRADE FINANCING, LLC,**
Appellant

v.

Juan Diego **ZELAYA** Aguilar,
Appellee

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2022CI19870
Honorable Nadine Melissa Nieto, Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice

Sitting:    Rebeca C. Martinez, Chief Justice
H. Todd McCray, Justice
Velia J. Meza, Justice

Delivered and Filed: March 25, 2026

REVERSED AND RENDERED, IN PART; REMANDED WITH INSTRUCTIONS

Appellant CR Trade Financing, LLC asserted a breach of a continuing guaranty claim against appellee Juan Diego Zelaya Aguilar. After a bench trial, the trial court signed a take-nothing final judgment in Zelaya's favor. In four issues, CR Trade argues that the trial court erred in: (1) concluding that Zelaya met his burden to prove that the continuing guaranty lacked consideration; (2) not concluding CR Trade proved as a matter of law that the continuing guaranty was supported by consideration; (3) rendering a final judgment that rejected CR Trade's breach of

continuing guaranty claim; and (4) failing to award CR Trade its attorney's fees. We reverse and render, in part, and remand with instructions.

## I. BACKGROUND

The continuing guaranty at the center of this dispute was preceded by an "Accounts Receivable Purchase and Security Agreement" between CR Trade and Alnost Honduras, a Honduran exporter. This underlying agreement set up a three-part factoring arrangement whereby: (1) Alnost Honduras exported nostalgic Honduran grocery goods; (2) Mi Pulpe, a United States company headquartered in Miami, Florida, imported the grocery goods into the United States; and (3) CR Trade purchased the invoices from Alnost Honduras. The factoring cycle began when CR Trade fronted Alnost Honduras eighty percent of the invoices' face value, up to a "maximum factoring facility" of $500,000. The underlying agreement provided an "invoice due date" of thirty days from the date of the delivery of the goods. Thus, thirty days after Mi Pulpe accepted the goods, it repaid CR Trade the full value of the invoices. CR Trade retained the eighty percent it initially fronted to Alnost Honduras and a factoring fee of approximately three percent, remitting the remaining seventeen percent back to Alnost Honduras.

The underlying agreement was not accompanied by a guaranty. Nevertheless, the first four factoring cycles, which occurred between the fall of 2021 and spring of 2022, completed without any problems. On June 27, 2022, a fifth factoring cycle began when CR Trade purchased several invoices and wired $310,960.67 to Alnost Honduras. Two days later, Leonardo Rajunov, CEO of CR Trade, learned that Mi Pulpe, Alnost Honduras's primary importer, was rejected by Coface, a French credit risk insurer, for a credit risk insurance policy. Rajunov was "deeply concerned" to learn that Coface rejected Mi Pulpe for insurance coverage. He noted that "if Mi Pulpe wasn't viable, you know, they are all so closely interlinked that it was basically that that ship was going

to sink all the other ships around it." Rajunov believed that CR Trade "either had to terminate the relationship or find some other type of security to mitigate the risk." Rajunov believed that a real estate or personal guaranty from an individual affiliated with Alnost Honduras was needed to protect CR Trade in the worst-case scenario wherein Mi Pulpe faltered. Rajunov directed Carlos Harding, CR Trade's director of international factoring, to obtain such a guaranty.

Harding reached out to Marco Antonio Villar Mondragon, a purported partner of Alnost Honduras and Harding's business contact at the exporter, to arrange a meeting between them and Zelaya. The three had dinner in the Woodlands on the evening of August 2, 2022. At the dinner, Harding presented the two with the continuing guaranty. Zelaya testified that Harding told them his job was on the line if they did not sign the continuing guaranty. Zelaya did not ask a lawyer to review the continuing guaranty. Instead, the next morning, Zelaya and Villar met Harding at a UPS store to sign the continuing guaranty before a notary. The continuing guaranty's preprinted text denotes Villar and Zelaya as each being a "partner" of Alnost Honduras. Zelaya emailed a scanned copy of the signed continuing guaranty to his email address at "MiPulpe.com." On cross examination by CR Trade, Zelaya acknowledged that he had an indirect business interest in the factoring relationship between CR Trade and Alnost Honduras.

Notwithstanding the continuing guaranty, the $310,960.67 that CR Trade wired to Alnost Honduras on June 27, 2022 went unpaid for the remainder of the summer. On October 3, 2022, Villar advised Harding that the dispute regarding repayment would need to be resolved through the parties' attorneys, and he requested the contact information for CR Trade's attorney. The next day, Rajunov requested that Alnost Honduras repurchase the Mi Pulpe invoices. On October 6, 2022, CR Trade sued Villar and Zelaya for breaching the continuing guaranty. CR Trade nonsuited Villar before trial.

At trial, Zelaya argued that the continuing guaranty failed for lack of consideration. Zelaya specifically argued that the underlying agreement automatically terminated when Rajunov became concerned about repayment after the June 27, 2022 factoring cycle was funded. Thus, according to Zelaya, the underlying agreement could no longer serve as consideration for the continuing guaranty. Moreover, the continuing guaranty, signed months after the underlying agreement, required, according to Zelaya, separate consideration. CR Trade posited that the continuing guaranty recited that it was supported by consideration, and the trial court need not have looked beyond the recital. CR Trade further posited that even if the trial court looked beyond the recital, the continuing guaranty was supported by CR Trade's forbearance. Zelaya countered that CR Trade's promise to forebear was merely illusory. The trial court signed a take nothing judgment in Zelaya's favor. At CR Trade's request, the trial court later signed findings of fact and conclusions of law. The trial court made the following relevant conclusions of law:

> 82. When a guaranty agreement is entered into independently of the transaction creating the debt or obligation, "the guarantor's promise must be supported by consideration distinct from the present debt" because "a guarantor's promise to pay an existing debt is not consideration." *The Fed. Deposit Ins. Corp. v. Williams*, No. 05-95-00029-CV, 1996 WL 457448, at *2 (Tex. App.—Dallas Aug. 7, 1996, no pet.).

> . . .

> 84. When a party guarantees indebtedness for which the primary debtor was already liable for, no new benefit flows either to the guarantor or the primary debtor. *Fourticq*, 679 S. W.2d at 565.

> . . .

> 86. The Continuing Guaranty needed independent consideration to be valid.

> 87. The Underlying Agreement could not serve as independent consideration for the Continuing Guaranty because it had been terminated and no longer existed on August 3, 2022.

> . . .

92.    Any testimony or evidence of CR Trade "forbearing" from exercising certain rights under the Underlying Agreement is not evidence of valid, independent consideration to support the Continuing Guaranty.  Moreover, Rajunov's testimony confirms that any intention or promise by CR Trade was illusory.

. . .

97.    The Continuing Guaranty lacked valid, independent consideration and is unenforceable against Mr. Zelaya.

CR Trade timely appeals.

## II. DISCUSSION

To prove a breach of a guaranty claim, CR Trade, as the holder, must show four elements: "(1) the existence and ownership of the guaranty agreement; (2) the terms of the underlying contract by the holder; (3) the occurrence of the conditions upon which liability is based; and (4) the failure or refusal to perform the promise by the guarantor." *Parsa v. WestStar Title, LLC*, No. 08-23-00135-CV, 2024 WL 688258, at *5 (Tex. App.—El Paso Feb. 20, 2024, no pet.) (mem. op.).

The dispute centers on whether the continuing guaranty existed — the first element of a breach of guaranty claim — or failed to exist because Zelaya established his affirmative defense of lack of consideration.  *See Lakeway Co. v. Leon Howard, Inc.*, 585 S.W.2d 660, 662 (Tex. 1979) (per curiam) ("Lack of consideration is an affirmative defense . . . ."); *see also Petroleum Workers Union of the Republic of Mexico v. Gomez*, 503 S.W.3d 9, 31 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Lack of consideration for a contract is an affirmative defense to its enforcement; therefore, the burden of proof is on the party alleging the lack of consideration.").

CR Trade's first two issues may be restated as a twofold argument: (1) the trial court erred in looking beyond the recitation of consideration in the continuing guaranty; (2) if necessary, the trial court need not have looked any further than CR Trade's actual forbearance between when the

continuing guaranty was signed and when it sued Zelaya. Zelaya's corresponding position is threefold: (1) the underlying agreement could not serve as consideration for the continuing guaranty because, by its own terms, it automatically terminated before the continuing guaranty was signed; (2) the continuing guaranty required its own consideration because it was entered into independently from the underlying agreement; and (3) any "promises" to forbear made by CR Trade were illusory and constituted merely invalid consideration.

## A. Standards of Review

When, as here, the trial court issues findings of fact and conclusions of law following a bench trial, "the trial court's findings of fact have the same weight as a jury verdict." *Flatten v. Oliphant Fin., LLC*, No. 04-24-00417-CV, 2025 WL 1649198, at *2 (Tex. App.—San Antonio Jun. 11, 2025, no pet.) (mem. op.) (quoting *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 534 S.W.3d 558, 582 (Tex. App.—San Antonio 2017), aff'd, 593 S.W.3d 324 (Tex. 2020)). "However, when the appellate record includes a reporter's record, a trial court's findings of fact are not conclusive and are binding only if supported by the evidence." *Teal Trading*, 534 S.W.3d at 582. "A trial court's findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer." *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We apply a de novo standard of review to the trial court's conclusions of law. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

In this case, Zelaya's arguments implicate only questions of law, which we will review de novo. *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021) ("Summary judgment and the construction of a contract present questions of law we review de novo."); *Marx v. FDP, LP*, 474 S.W.3d 368, 378 (Tex. App.—San Antonio 2015, pet. denied)

("What constitutes consideration is a question of law and is reviewed de novo."); *Graybar Elec. Co., Inc. v. Buying Power, Inc.*, No. 14-24-00683-CV, 2026 WL 234659, at \*6 (Tex. App.— Houston [14th Dist.] Jan. 29, 2026, no pet.) (mem. op.) ("Whether a contract is illusory is a question of law for the court.").

Zelaya bore the burden of proof regarding his lack of consideration contentions. *Gomez*, 503 S.W.3d at 31.

## B. Termination

As a threshold matter, the trial court, under Conclusion of Law No. 87, concluded that the underlying agreement could not serve as consideration for the August 3, 2022 continuing guaranty because it had automatically terminated on June 29, 2022, just two days after the fifth factoring cycle had been funded. As support, Zelaya references three provisions in the underlying agreement that provide:

### 14. **Default**

14.1 Events of Default. The following events will constitute an Event of Default hereunder: . . . (g) a material adverse change shall have occurred in Seller's financial conditions, business or operations; or (h) Purchaser, in good faith, *deems itself insecure with respect to the prospect of repayment or performance of the Obligations*.

14.2 **Effect of Default**. Upon the occurrence of any Event of Default:

14.2.1 In addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate, suspend and/or seek adequate assurances in respect to this Agreement, at which time all Obligations shall immediately become due and payable without notice.

. . .

17. **Termination; Effective Date**

. . .

> 17.3 Purchaser may terminate the Term of this Agreement by giving Seller at least thirty-day's (30) prior written notice of termination, or, in the event that *Seller commits* an Event of Default, this Agreement shall be deemed terminated ("Early Termination Date").

(Emphasis added). Additionally, the underlying agreement defines "Obligations" as:

> All present and future obligations and liabilities owing by Seller to Purchaser, whether direct or indirect, absolute or contingent, including obligations and liabilities that are likely to become owing by Seller to Purchaser, whether arising hereunder or otherwise, and whether arising before, during or after the commencement of any case filed under title 11 of the United States Bankruptcy Code or any other debtor relief proceeding in which Seller is a Debtor.

Zelaya argues that "Section 17.3 is specific and applies to 'events of default caused by Seller,' whereas Section 14.2.1 is a general provision not meant to cover 'events of default caused by Seller.'" Zelaya highlights Rajunov's testimony that "if Mi Pulpe wasn't viable, you know, they are all so closely interlinked that it was basically that that ship was going to sink all the other ships around it." As we understand Zelaya's argument, Rajunov's concern regarding Mi Pulpe's financial condition constituted an "Event of Default" under Section 14.1(g) and (h), and such an event triggered Section 17.3's automatic termination provision because Alnost Honduras's financial fortunes were tethered so closely to Mi Pulpe.

Zelaya's argument, according to CR Trade, misapprehends that the "Seller" in Section 17.3 is Mi Pulpe when in fact the "Seller" is Alnost Honduras because it "sold" invoices to CR Trade. CR Trade faults Zelaya's interpretation as reading the phrase "in the event the Seller commits an Event of Default" out of Section 17.3. It emphasizes that "Zelaya has failed to identify any event of default 'caused by' Alnost Honduras. By not identifying an event of default caused by Alnost

Honduras, Zelaya has failed to identify any evidence giving rise to termination under Section 17.3 of the Purchase Agreement."

CR Trade's interpretation more appropriately harmonizes Section 14.1(h) and (g) with Section 17.3. *See Sundown Energy*, 622 S.W.3d at 888 ("Equally important, we avoid construing contracts in a way that renders contract language meaningless."). In order for the underlying agreement to be "deemed terminated" Alnost Honduras, as the "Seller," must "commit" an "Event of Default." Mi Pulpe's failure to obtain Coface insurance or Rajunov's concern that "that ship was going to sink all the other ships around it" were not events "committed" by Alnost Honduras.

The trial court erred in making Conclusion of Law No. 87.

## C. Consideration

Next, under Conclusion of Law No. 86, the trial court concluded that the continuing guaranty needed independent consideration to be valid. CR Trade argues that in *Beltran v. Groos Bank, N.A.*, 755 S.W.2d 944, 948 (Tex. App.—San Antonio 1988, no writ), we rejected any attempt to look beyond the recitation of consideration in the continuing guaranty at issue in that case. In *Beltran*, we looked to Section 88 of the Second Restatement of Contracts, which provides:

**GUARANTY**

A promise to be surety for the performance of a contractual obligation, made to obligee, is binding if

(a) the promise is in writing and signed by the promisor and recites purported consideration; or

(b) the promise is made binding by statute; or

(c) the promisor should reasonably expect the promise to induce action or forbearance of a substantial character on the part of the promisee or a third person, and the promise does induce such action or forbearance.

*See id*. (quoting RESTATEMENT (SECOND) ON CONTRACTS, § 88 (Am. Law Inst. 1981)). We also surveyed comment D under Section 88, which provides in part: "Like Section 87 on option contracts, this [S]ection . . . precludes inquiry into the question whether the consideration recited in a written contract of guaranty was a mere formality or pretense, or whether it was in fact given." *Beltran*, 755 S.W.2d at 948 (quoting RESTATEMENT (SECOND) ON CONTRACTS, § 88 cmt. d) (alterations and ellipsis in original).

In *Beltran*, an attorney with no interest in his client's restaurant signed a letter of guaranty in the amount of $13,000. *See id*. at 945. The guaranty letter recited that consideration was to be $1.00, but the attorney testified at trial that he never received the "money" that was to be paid to him. *Id*. at 948. On appeal, the attorney complained of a lack of consideration for the letter of guaranty. *Id*. We rejected the attorney's argument, writing that "[t]he guaranty agreement was in writing and signed by appellant[,]" and it "recites purported consideration." *Id*. We also noted that "[f]urther, we find, according to Section 88(c), that appellant should reasonably have expected that his signature on the letter of guaranty would induce the bank to lend money to" the attorney's client. *Id*.

Zelaya argues that *Beltran* is distinguishable on the facts because "[t]he individual signed the guaranty agreement contemporaneously with the loans, and there was evidence the bank considered the guaranty when making the loans." Zelaya also argues that "[s]ince *Beltran* in 1988, no other court of appeals, either in San Antonio or in the State of Texas, has adopted its reasoning."[1] Zelaya primarily relies on *Fourticq v. Fireman's Fund Ins. Co.*, 679 S.W.2d 562,

---

[1] Zelaya references Section 5.001(b) of the Texas Civil Practice and Remedies Code for his argument that "the Restatement is not controlling law in the State of Texas." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 5.001(b) ("In any action governed by the laws of this state concerning rights and obligations under the law, the American Law Institute's Restatements of the Law are not controlling."). Nevertheless, in *Beltran* we found Section 88 of the Second Restatement on Contracts persuasive, and we do not read Section 5.001(b) as superseding *Beltran*. Accordingly, we are bound by our holding in *Beltran*. *See Mitschke v. Borromeo*, 645 S.W.3d 251, 256 (Tex. 2022) (explaining that

564 (Tex. App.—Dallas 1984, no writ), for its holding that if "a contract of guaranty is entered into independently of the transaction which created the primary debt or obligation, the guarantor's promise must be supported by consideration distinct from that of the primary debt." He emphasizes that the underlying agreement was executed in October 2021, automatically terminated on June 29, 2022, and therefore, could not have served as consideration for the August 3, 2022 continuing guaranty. [2]

Our sister court relied on *Fourticq* in *First Commerce Bank v. Palmer*, 226 S.W.3d 396, 398 (Tex. 2007) ("The court [of appeals] further reasoned that because four months passed between the date of the note and the guaranty agreements that some new consideration, independent of the promissory note, was required.").[3] The Texas Supreme Court reversed. *Id*. at 397. The Court in *Palmer* observed:

> Determining whether a guaranty agreement is independent of the debt it guarantees, however, is not simply a question of the order in which the documents are signed. If the guarantor's promise is given as part of the transaction that creates the guaranteed debt, the consideration for the debt likewise supports the guaranty. And even when the guaranty is signed after the principal obligation, the guaranty promise is founded upon a consideration if the promise was given as the result of previous arrangement, the principal obligation having been induced by or created on the faith of the guaranty. Guaranty agreements that post-date the underlying obligation have thus often been enforced in Texas without the requirement of additional consideration to the guarantor.

---

under the principle of horizontal stare decisis, "three-judge panels must follow materially indistinguishable decisions of earlier panels of the same court unless a higher authority has superseded that prior decision.").

[2] In *The Federal Deposit Insurance Corporation v. Williams*, No. 05-95-00029-CV, 1996 WL 457448 at * 2 (Tex. App.—Dallas Aug. 7, 1996, no writ), our sister court followed its earlier holding in *Fourticq*, holding:

> The trial court effectively determined the evidence rebutted the presumption of consideration . . . and that Williams agreed to guaranty an existing debt that was not supported by consideration distinct from that debt. Based upon these factual findings, the trial court's conclusion of law that Williams's guaranty failed for want of consideration is correct.

*Id*. Zelaya references *Williams*, 1996 WL 457448 at * 2, as additional supporting authority.

[3] Zelaya references *Palmer*, among other opinions, as support for his argument that "courts of appeals in Texas continue to analyze cases in which a party asserts lack of consideration for a guaranty because it was entered independently of the underlying contract by assessing whether the guaranty actually was entered into independently and whether the guaranty supplied its own consideration to be valid."

*Id*. at 398 (internal citations and quotation marks omitted). The Court concluded that there was consideration for the 1988 guaranty agreements in the form of the bank's forbearance on the 1983 guaranties as well as an agreement to renew and extend a related venture's original debt. *Id*. at 399. Thus, forbearance may constitute consideration for a guaranty.

The trial court erred in making Conclusion of Law No. 86.

### D.      Forbearance

Third, in Conclusion of Law No. 92, the trial court concluded that any testimony or evidence of CR Trade "forbearing" from exercising certain rights under the underlying agreement is not evidence of valid, independent consideration to support the continuing guaranty. This conclusion also concludes that Rajunov's testimony confirms that any intention or promise by CR Trade was illusory.

Referencing *Palmer's* holding that the bank's forbearance constituted consideration, CR Trade argues that even if the purchase agreement automatically terminated on its own terms on June 29, 2022, it "still had options moving forward and its forbearance from exercising those options serves as consideration for the continuing guaranty." Zelaya argues that CR Trade's promise was illusory because Harding repeatedly sought payment from Villar between August 3, 2022 and when suit was filed on October 6, 2022. CR Trade, in its opening and reply brief highlights that between June and October 2022, it did not declare a default, did not request that Alnost Honduras repurchase the invoices, and did not file suit. This, according to CR Trade, constitutes actual forbearance, and it dispenses with Zelaya's contention that its promise of forbearance was illusory. As support, CR Trade references *Doncaster v. Hernaiz*, 161 S.W.3d 594, 604 (Tex. App.—San Antonio 2005, no pet.), wherein we observed that "[i]n addition to the presumption of consideration raised by the written contract, the evidence establishes that [the

appellant] in fact did receive consideration for execution of the note, both in the form of a benefit to her and forbearance by [the appellee]." We held that the appellant failed to establish lack of consideration as an affirmative defense to summary judgment. *Id*.

In this case, Rajunov testified that a typical factoring cycle is either thirty or sixty days. Indeed, the underlying agreement provides for a thirty-day factoring cycle. CR Trade waited sixty-four days from August 3, 2022 before filing suit. This delay essentially extended to Zelaya the time of over one full factoring cycle — in addition to the initial cycle that began on June 27, 2022 — before suit was filed. Under these facts, such a delay constitutes actual forbearance. *See id*.

The trial court erred in making Conclusion of Law No. 92.

### E.     Breach of a Guaranty

Zelaya failed to establish his affirmative defense of lack of consideration. Concomitantly, CR Trade established the first — and only contested — element of its breach of guaranty claim. We sustain CR Trade's first, second, and third issues.

### F.     Attorney's Fees

In CR Trade's fourth issue, it argues that the trial court erred in failing to award its attorney's fees. The continuing guaranty provides that "Guarantor agrees to reimburse Creditor on demand for the actual costs including . . . [a]ttorneys' fees, which Creditor has incurred or may incur in enforcing this Agreement . . . ." Zelaya argues that because CR Trade could not succeed on its breach of continuing guaranty claim the trial court correctly denied CR Trade's request for attorney's fees. Having sustained CR Trade's first, second, and third issues, CR Trade has shown its entitlement to reasonable attorney's fees and costs resulting from Zelaya's breach of the continuing guaranty. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(b)(8). We sustain CR Trade's

fourth issue.  On remand, the trial court must determine the amount of reasonable attorney's fees and costs.

## III. CONCLUSION

We reverse the trial court's final judgment and render judgment in CR Trade's favor on its breach of continuing guaranty claim.  We remand with instructions for the trial court to determine the amount of reasonable attorney's fees and costs that CR Trade requests.

Rebeca C. Martinez, Chief Justice