CHAMBERS BROTHERS *vs.* JOSEPH CHURCH & COMPANY *et als.*

The statute of the State of Virginia, Code of 1873, cap. 100, § 4, which forbids non residents to catch fish for the manufacture of manure and oil, and to manufacture manure and oil from fish caught within the waters of that State, is not in violation of Article IV. section 2, of the Constitution of the United States.

A contract to be executed wholly in Virginia in violation of this statute will not be enforced in Rhode Island. Nor can a bill in equity be sustained in Rhode Island for an account of profits of such a contract which has been executed.

BILL IN EQUITY for an account.

*Providence, March* 1, 1884. STINESS, J. Bill in equity for an account under an agreement between complainants of New York, defendants of this State, and Robert Polk of Virginia, by which the latter leased his fish oil works in Virginia to the defendants for seven twenty fourths of the net profits of the business up to March 1, 1882, which were to be paid to the complainants.

A statute of Virginia makes the manufacture of oil and the tak-

ing of fish for that purpose, by non residents, in any of the waters of the State, unlawful. Code of Virginia, 1873, cap. 100, § 4.[1]

The defendants answer that the agreement was in violation of this statute and therefore void; also that under the statute, by process of law, they were prevented from executing the contract; to which the complainants reply that such a statute is unconstitutional and cannot be set up in defence.

Article IV. section 2, of the Constitution of the United States, provides that " the citizens of each state shall be entitled to all the privileges and immunities of citizens of the several states," and under this provision the complainants contend that the State of Virginia had no right to pass a law like the one in question, because it is a discrimination against citizens of other states, which deprives them of privileges permitted to citizens of Virginia.

This section has frequently been brought before courts for construction, and its meaning and application are now quite definitely determined.

It was intended to give a unity to the people of this nation which would not otherwise follow from a league of separate and independent states. It means that citizens of one state shall not be treated as aliens in other states, but shall have, throughout the land, all the privileges and immunities which are incident to citizenship. It does not obliterate all distinctions which may arise

---

[1] As follows :

" Hereafter it shall not be lawful for non residents to take or catch fish in any of the waters of this commonwealth for the purpose of grinding, pressing, or manufacturing oil or manure from the same; nor shall any non resident grind up or press any fish taken or caught in the waters of this State, or manufacture the same into oil or manure; nor shall any non resident build or erect within the limits of this State any machinery or apparatus of any kind for the purpose of manufacturing oil or manure from fish; provided, however, that this act shall not apply to non residents who are *bonâ fide* owners of land within this State, and who occupy and cultivate said land by their agents, tenants, or laborers, but such non residents are hereby allowed, on the same terms as citizens of this State, to take or catch fish in any of the waters thereof, for the purpose of making compost, grinding up, pressing, or manufacturing oils or manures, so that the said composts, oils, or manures be applied and used by said owners, their agents, tenants, or laborers, solely for improving and manuring their said lands."

from the fact of residence, nor deprive a state of the right to make laws which discriminate in favor of residents to the exclusion of non residents, so long as the fundamental rights of citizens of other states are not disturbed. For example, a non resident cannot vote, hold office, practise law, or enjoy school and many other privileges simply because he is a citizen and has those rights in another state. As stated by Curtis, J., in *Connor* v. *Elliott*, 18 How. U. S. 591, a case under a law of Louisiana, which secured community of property to married persons resident in that State, " No privileges are secured except those which belong to citizenship." See, also, Story on the Constitution, 4th ed. § 1806 ; Cooley on Constit. Limit. 15, n. 4, and cases cited.

Is the right to take fish and to manufacture oil therefrom a right of citizenship which is included in this provision of the Constitution ?

In *Corfield* v. *Coryell*, 4 Wash. C. C. 371, the question now before the court was presented. A law of New Jersey declared : " It shall not be lawful for any person who is not at the time an actual inhabitant and resident in this State, to rake or gather clams, oysters," &c., in any of the waters of this State. Washington, J., held that the law was not unconstitutional ; upon the ground that the right of fishery is a right of property and not a right of citizenship. The distinction is clear. Under colonial charters the right of fishery was vested in each colony for the benefit of its own people and was under its own control. This right has never been ceded. The federal government has control of navigable waters for the purpose of commerce and defence, but the fisheries remain the common property of the people of the State.

This question is also thus decided in *State* v. *Medbury*, 3 R. I. 138. That case sustained the constitutionality of our own law, which provided that no person should take shell fish from the shores or waters of this State, " unless he be an inhabitant thereof and domiciled therein."

The rights which pertain to citizenship are of a notably different character ; *e. g.* the right to transact business in other states, *Ward* v. *Maryland*, 12 Wall. 418 ; the right of acquiring and conveying property, of suing in courts, of protection by law, of freedom from discriminating taxes and burdens, and the like.

*Campbell* v. *Morris*, 3 Har. & McH. 535, 554; *Ward* v. *Morris*, 4 Har. & McH. 330, 341, and cases referred to above.

The provision relating to the manufacture of fish oil and manure, in this statute, might, if it stood alone, come within the doctrine of *Ward* v. *Maryland*, as to restrictions upon trade and business. But it does not. It is a part of the same section which forbids the taking of fish for the purpose of grinding into oil or manure, and is in aid of the latter provision to prevent its evasion. It only forbids the grinding of fish taken in the waters of the State. The object of the law is not to deprive citizens of other states of the right to do business in Virginia, but to protect the fisheries from depletion. The statute is evidently directed against the conversion of fish into merchandise, to be sent abroad, for other uses than food. For their own agriculture it may be necessary to allow citizens to take fish for manure. Indeed this very section gives to non residents, owning lands in the State, the same rights as residents to take and grind fish "for improving and manuring their said lands." To allow others, however, to engage in that business, to scatter its products, would be quite a different thing.

We therefore hold that the statute of Virginia is not repugnant to Article IV. section 2, of the Constitution of the United States.

The next question which arises is whether the contract, in violation of that statute, can be enforced. This question arose and was exhaustively considered in the cases of *Snell* v. *Dwight*, 120 Mass. 9, and *Dunham* v. *Presby*, 120 Mass. 285. Those cases were upon contracts for illegal trading with inhabitants of states declared in insurrection against the United States. In the former case, Endicott, J., clearly states the law as follows: "It is well settled that when a contract is illegal and prohibited by law no action can be maintained upon it in law or equity, either to enforce its obligations or to secure its fruits to either party; and where a party cannot maintain his action without showing an illegal act on his part he must fail in his suit."

In view of the elementary maxim, *Ex turpi causâ non oritur actio*, even this reference would seem to be unnecessary, were it not that to some extent the doctrine has been recognized that

equity may compel the division of a fund or other products originally created by an illegal transaction. The cases cited in Massachusetts discuss this doctrine, and we consider their conclusions sound and decisive of this case. It is difficult to see upon what logical ground courts can refuse to enforce the illegal contract itself, and yet compel the enforcement of rights which spring from it ; refuse to compel a party to account for the profits of an illegal contract, and yet require him to do so when those profits have been invested and thus changed their form.

In this case, however, we think the complainants seek to enforce the contract itself. The fact that it has been executed, as far as it could be, and that the profits have resulted in a fund in the defendants' possession, do not change the real nature of the claim. The relief sought for is the right to share in profits as stated in the contract. Such relief granted would be nothing else than an enforcement of the contract.

In this opinion we, of course, assume that the whole contract was to be executed in Virginia, including the catching of fish, as set up in the answer. If upon proof such is not the fact the statute of Virginia will have no application.

_Francis B. Peckham & Darius Baker_, for complainants.

_William P. Sheffield & William P. Sheffield, Jun._, for respondents.