FIRST COMMERCE BANK, f/k/a
Brazosport Bank of Texas,
Petitioner,

v.

Christine PALMER, Individually, and
Christine Palmer and Frederick A.
Palmer III, Independent Co–Execu-
tors of the Estate of Frederick A.
Palmer, Jr., Respondents.

No. 05–0686.

Supreme Court of Texas.

Argued Nov. 14, 2006.

Decided June 1, 2007.

R. Hayden Burns, Liskow & Lewis, P.C., Houston TX, for Petitioner.

Katrina Dannhaus Packard, Katrina Dannhaus Packard, P.C., Schulenburg, TX, for Respondent.

Karen Sue Neeley, Cox Smith Matthews Incorporated, and John Mark Heasley, Austin TX, for Amicus Curiae.

Justice MEDINA delivered the opinion of the Court.

The issue in this case is whether there was a lack or failure of consideration for

two guaranty agreements. The two guaranty agreements were among others required by the creditor and given by shareholders of the corporate debtor. The trial court refused to enforce the guaranties, finding problems with the underlying consideration, and the court of appeals affirmed. 165 S.W.3d 366. We, however, disagree that there was either a lack or failure of consideration. Accordingly, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

Fred Palmer, Jr. and three business associates owned equal shares in J.V.3, Inc., a Texas corporation, which held title to 260 acres in Brazoria County, near Danbury, Texas. Palmer and his associates intended to develop this land as a country subdivision, but these plans failed. They then decided to use the land as a grass farm and formed a partnership for that purpose, the Quail Creek Grass Farm, which leased the land from J.V.3.

About this same time, J.V.3 began attempting to refinance the 260 acres in order to pay off the family who had sold it the property. Before that could be done, however, Fred Palmer, Jr. died. Palmer's widow and his son were named co-executors of his estate.

About six months after Palmer's death, J.V.3 refinanced the property with a $1,000,000 loan from the First Commerce Bank, then known as the Brazosport Bank of Texas. J.V.3's president signed the promissory note on March 30, 1983, and all of J.V.3's shareholders, including Palmer's widow and his estate (hereafter the "Palmers"), signed their approval and acceptance of the note. The Bank also required individual guarantees from all J.V.3 shareholders, and again the Palmers signed as guarantors.

The 1983 promissory note granted the Bank the right to accelerate upon sixty days notice prior to the note's annual anniversary date. After about five years, the Bank elected to accelerate, notifying J.V.3 and its shareholders by letter on January 11, 1988. The Bank, however, also informed J.V.3 that it might renew the note on March 30, 1988, under certain terms and conditions outlined in the letter. The conditions included a request for current financial statements from all guarantors, including the Palmers.

J.V.3 decided to renew, and a new note was executed bearing the date of the original note's fifth anniversary, March 30, 1988. Once again, each shareholder agreed to guarantee the corporation's debt, but guarantees from the Palmers were not signed until August 9. On August 10, J.V.3 and all shareholders, including the Palmers, signed a document entitled modification, renewal, and extension of real estate note and lien, reciting the terms of their March 30, 1988 agreement with the Bank. The Bank contended that the promissory note was also executed at that time and backdated to March 30, 1988, but the date on which the note was actually signed was in dispute at trial.

About four years after the note's renewal, the Bank demanded payment from the guarantors, notifying them that J.V. 3 had stopped making payments. Litigation ensued, and the Bank eventually settled with J.V.3 and all guarantors except the Palmers. The remaining claims were set for a bench trial.

Before that trial commenced, the court identified the two issues remaining in dispute as: (1) the date the second promissory note was signed; and (2) the amount to be credited against the note because of the Bank's prior settlements. The trial began with the Bank presenting its case through the testimony of its president. The Bank then rested, and the Palmers moved for

directed verdict, arguing that their 1988 guaranties could not be enforced because there was either a lack or failure of consideration. The trial court apparently agreed because it granted the Palmers' motion and rendered judgment that the Bank take nothing. The Bank appealed, and the court of appeals affirmed the trial court's judgment. 165 S.W.3d 366.

As documented in the pretrial order, the trial court viewed the timing of the renewal note's execution as the primary issue. The Bank's president testified that the 1988 note's purpose was to renew and extend J.V.3's 1983 debt. He further testified that the renewal note was executed after all the shareholders had signed their guaranties, including the Palmers, but was backdated to March 30, 1988, the anniversary date on which the original note was to be rolled into the new one.

The court of appeals concluded, however, that the March 30 date on the promissory note was some evidence that it was executed before the Palmers' guaranties and that the trial court was free to disbelieve the Bank president's testimony to the contrary. 165 S.W.3d at 369. The court further reasoned that because four months passed between the date of the note and the guaranty agreements that some new consideration, independent of the promissory note, was required. 165 S.W.3d at 368–70. The court gleaned this requirement from *Fourticq v. Fireman's Fund Ins. Co.*, in which the court of appeals stated that when "a contract of guaranty is entered into independently of the transaction which created the primary debt or obligation, the guarantor's promise must be supported by consideration distinct from that of the primary debt." *Id.* at 368 (quoting *Fourticq v. Fireman's Fund Ins. Co.*, 679 S.W.2d 562, 564 (Tex.App.-Dallas 1984, no writ) (emphasis omitted)).

Determining whether a guaranty agreement is independent of the debt it guarantees, however, is not simply a question of the order in which the documents are signed. If the guarantor's promise is given as part of the transaction that creates the guaranteed debt, the consideration for the debt likewise supports the guaranty. *Universal Metals & Mach., Inc. v. Bohart*, 539 S.W.2d 874, 878 (Tex. 1976). And even when the guaranty is signed after the principal obligation, "the guaranty promise is founded upon a consideration if the promise was given as the result of previous arrangement, the principal obligation having been induced by or created on the faith of the guaranty." 38 Am.Jur.2d *Guaranty* § 43 at 905 (1999). Guaranty agreements that post-date the underlying obligation have thus often been enforced in Texas without the requirement of additional consideration to the guarantor. *See, e.g., Bohart*, 539 S.W.2d at 878 (machinery delivered before guaranty signed); *Windham v. Cal–Tim, Ltd.*, 47 S.W.3d 846, 849–50 (Tex.App.-Beaumont 2001, pet. denied) (guaranty signed two months after lease); *Holland v. First Nat'l Bank*, 597 S.W.2d 406, 410 (Tex.Civ. App.-Dallas 1980, writ dism'd) (guaranty signed after note); *Maykus v. Texas Bank & Trust Co. of Dallas*, 550 S.W.2d 396, 397 (Tex.Civ.App.-Dallas 1977, no writ) (same); *Waller v. Missouri City State Bank*, 482 S.W.2d 40, 41–43 (Tex.Civ.App.-Tyler 1972, writ ref'd n.r.e.) (same).

The question then is whether the Palmers' 1988 guaranties were independent transactions. They were not, of course, because these guaranties without dispute were signed in connection with the renewal of the 1983 note. Had that note not been renewed, J.V.3 and the guarantors, including the Palmers, would have been responsible for paying it in 1988. The Palmers thus benefited from the re-

newal and extension of their obligation to repay the earlier note. *See Simpson v. MBank Dallas, N.A.,* 724 S.W.2d 102, 107 (Tex.App.-Dallas 1987, writ ref'd n.r.e.) (restructuring of existing debt conferred benefit upon guarantor that constituted consideration supporting guaranty). Moreover, the first "Unlimited Continuing Guaranty Agreement" signed by the Palmers in 1983 provided in Paragraph 3 that their guaranties were "absolute, complete and continuing" and were to continue upon any extension or renewal of J.V.3's debt:

> 3. The guaranty is an absolute, complete and continuing one, and no notice of the Indebtedness or any extension of credit already, or hereafter, contracted by or extended to the Borrower need be given to the Guarantor. *Borrower and Bank may rearrange, extend and/or renew the Indebtedness without notice to the Guarantor and in such event Guarantor will remain fully bound hereunder on such Indebtedness.* The Guarantor hereby expressly waives presentment, demand, protest and notice of protest and dishonor on any and all forms of such Indebtedness, all diligence in collection or protection of or realization upon the Indebtedness, or any part thereof or any security therefor, and also notice of acceptance of this guaranty, acceptance on the part of Bank, being conclusively presumed by its request for this guaranty and delivery of same to it.

(Emphasis added). Thus, we conclude that there was consideration for the Palmers' 1988 guaranty agreements, consisting of the Bank's forbearance on the 1983 guaranties, as well as its agreement to renew and extend J.V.3's original debt.

■ The Palmers, however, also contend that they were released from their guaranties because the Bank allowed the underlying collateral to be impaired. Specifically, they complain that the Bank allowed J.V.3 to sell the real property securing the note to Quail Ridge Grass Farms and that this sale impaired the Bank's rights to the collateral. The Bank's president disagreed, testifying that the Bank did not consent to this transaction and was unaware of it at the time. The Bank further submits that, in any event, the transaction did not adversely affect its secured position because the real estate was conveyed by an assumption deed which recognized the Bank's interest in the property.

More to the point, however, the Bank argues that preservation of the collateral was not part of the consideration for the Palmers' guaranties in the first place. In fact, the Palmers expressly disclaimed any right to complain about the Bank's handling of the collateral in paragraphs 4 and 5 of their guaranty agreements. Paragraph 4 authorized the Bank to "waive and release" any security, and paragraph 5 relieved the Bank of any obligation to proceed against or exhaust any particular security. Such waivers have been enforced by Texas courts. *See, e.g., Fed. Deposit Ins. Corp. v. Coleman,* 795 S.W.2d 706, 710 (Tex.1990); *Bohart,* 539 S.W.2d at 877. Accordingly, even had evidence existed of impairment of collateral in this case, it would not have amounted to a failure of consideration for the Palmers' guaranties.

■ Finally, the Bank contends that we should render judgment in its favor instead of remanding the case to the trial court. In this regard, the Bank argues that the Palmers waived their right to litigate the credits due them from the Bank's previous settlements because they failed to present any evidence in support of their claims. But since the trial court improvidently granted the motion for directed verdict, the Palmers did not have the need or opportunity to present evi-

dence of any other defenses or credits due them. They should have that opportunity. TEX. R. APP. P. 60. Accordingly, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.