DECISION
Before this Court is a Super. R. Civ. P. 56 motion for summary judgment brought by Plaintiff CIC-Newport Associates, LP (Plaintiff or CIC-Newport) against Defendants Jung Kang Lee (Lee), Kyu Man Jeong (Jeong), and Sea Shai Hibachi Garden, Inc. (Sea Shai) (collectively, Defendants). CIC-Newport claims it is entitled to summary judgment because no genuine issues of material fact or ambiguities of law exist, and therefore, it seeks (1) a judgment against Lee and Jeong under their personal guaranties for the total amount of rent, late fees, and interest owed pursuant to the Lease totaling $102,333.49; (2) a judgment against Lee in connection with the BankNewport Promissory Note in the amount of $72,882.14, plus interest; (3) an order granting CIC-Newport the entire proceeds received from the sale of the Class BL Liquor License; and (4) an award of reasonable attorneys' fees, interest, and costs incurred in pursuing this matter.
 I Facts and Travel The Lease
CIC-Newport is a Rhode Island limited partnership and the owner and landlord of the property located at 10A-14 Long Wharf Mall South, Newport, Rhode Island (Property). See *Page 2 
Henken Aff. ¶¶ 1-2.[1] Sea Shai was a Rhode Island corporation formed to operate Sea Shai Hibachi Garden (Restaurant) and a commercial tenant formerly occupying the Property. See Lee Aff. ¶ 4. Lee and Jeong were shareholders of Sea Shai, with Lee having a 51% interest and Jeong having 49%. See Lee Dep. Tr. 44:3-9, June 10, 2010. The Restaurant occupied the Property pursuant to a ten-year commercial lease (Lease) executed by the parties on or about March 25, 2004.[2] See Pl.'s Summ. J. Mem. Ex. A.
From November 2007 through February 2008, Sea Shai failed to make rental payments. See Lee Dep. Tr. 62:7-63:9, June 10, 2010; Pl.'s Summ. J. Mem. Ex. E. As a result, CIC-Newport and Sea Shai entered into a Forbearance Agreement dated March 28, 2008. See Pl.'s Summ. J. Mem. Ex. C. The Forbearance Agreement provided that in light of Sea Shai's failure "to pay various sums due under the terms of the Lease, including rent and late charges and interest accrued on account of such nonpayment (hereinafter, referred to as `Arrearages' . . . [,]" CIC-Newport was entitled to terminate the Lease, to institute and prosecute eviction proceedings, to obtain an execution allowing CIC-Newport to recover possession of the Property, and to collect any amounts owed by Sea Shai. Id.
Notwithstanding the foregoing, CIC-Newport agreed to forebear from enforcing its rights for a period of time, contingent upon Sea Shai making stipulated payments to account for the Arrearages.[3]Id. In the event that Sea Shai failed "to fully and punctually comply with the *Page 3 
provisions" of the Forbearance Agreement, CIC-Newport could immediately proceed to enforce its rights and remedies.[4] Id.
Additionally, Lee[5] and Jeong[6] executed personal guaranties (Guaranties) dated March 28, 2008 and March 31, 2008, respectively. (Pl.'s Summ. J. Mem. Ex. F.) The Guaranties stated:
 "[A]t the request of the Guarantor, [CIC-Newport joined] with [Sea Shai] in the execution of an agreement of even date herewith (hereinafter referred to as the `Forbearance Agreement') providing for the payment of various sums due under said lease (said lease, *Page 4 
together with the Forbearance Agreement, being hereinafter collectively referred to as the `Lease')." Id.
Under the Guaranties, Lee and Jeong "unconditionally and absolutely guarantee[d] the full performance and observance of all the terms, covenants, conditions and agreements contained in the Lease on the part of [Sea Shai] to be performed and observed." Id. Moreover, the Guaranties acknowledged that (1) they were "being made in order to induce [CIC-Newport] to enter into the Forbearance Agreement," (2) CIC-Newport's execution and delivery of the Forbearance Agreement was conditioned on Lee and Jeong's execution of the Guaranties, and (3) Lee and Jeong had received adequate and fair consideration for the Guaranties. Id.
On July 2, 2008, the parties agreed to an Amended Consent Judgment after Sea Shai failed to tender payments in accordance with the Forbearance Agreement. See Lee Dep. Tr. 65:17-24, 72:20-75:17, June 10, 2010; Pl.'s Summ. J. Mem. Ex. J. The Amended Consent Judgment set forth a revised payment schedule for back rent and late fees. Id. When Sea Shai failed to make payments in accordance with the Amended Consent Judgment, a Writ of Execution was issued on January 15, 2010 for possession of the Property and the $22,722.74 balance due under the terms of the Forbearance Agreement and Amended Consent Judgment. See Pl.'s Summ. J. Mem. Exs. E K.
Defendants have failed to make rental payments under the terms of the Lease since CIC-Newport retook possession of the Property in January 2010. See Pl.'s Summ. J. Mem. Ex. E. On March 9, 2010, having retaken possession of the Property pursuant to the Writ of Execution, CIC-Newport held a Sheriff's sale in which all items and equipment at the Property were sold. See Pl.'s Summ. J. Mem. Ex. L. After costs, CIC-Newport collected approximately $20,578 in proceeds from the sale. Id.; Henken Aff. ¶ 4. *Page 5 
Under the Lease:
 "In the event that:
 (a) [Sea Shai] shall default in the payment of rent or any other sum payable under this Lease and such default shall not be corrected within twenty (20) days after written notice thereof . . . then [CIC-Newport] shall have . . . the right to declare the term of this Lease ended, and thereafter may undertake appropriate proceedings to complete possession of the [Property] and to remove all other goods and effects of [Sea Shai], without prejudice to any remedies which might otherwise be used for arrears of rent or other default. [Sea Shai] shall, in case of any such termination, forthwith pay to [CIC-Newport] as damages a sum equal to the amount by which the rent and other payments called for hereunder for the remainder of the term of this Lease exceed the fair rental value of the [Property] for said period, and in addition thereto will furthermore promptly indemnify [CIC-Newport] during said period against all loss of such rent and other payments which [CIC-Newport] may incur by reason of such termination, however caused, first deducting any damages paid as herein above setforth." See Pl.'s Summ. J. Mem. Ex. A ¶ 18 (emphasis added).
Therefore, Plaintiff alleges that they are owed $102,333.49 in rent and late fees.[7] See Henken Aff. ¶¶ 2-3. In August 2010 and October 2010, CIC-Newport subsequently re-rented the Property.[8] Id. ¶ 6.
 BankNewport Promissory Note
The following facts are undisputed. On or about September 1, 2006, Lee signed a BankNewport Promissory Note (BankNewport Note) in the amount of $87,500 plus interest in order to purchase equipment for the Restaurant.See Pl.'s Summ. J. Mem. Ex. N. Under the *Page 6 
BankNewport Note, a "Default" constitutes the "failure of the maker to pay or perform any obligation or indebtedness to the Bank under [the BankNewport Note] or any other note, agreement, or instrument now existing or thereafter arising." Id. In the event of a default, BankNewport was entitled to declare the entire unpaid balance under the BankNewport Note, as well all other indebtedness obligations and liabilities owed to the Bank, immediately due and payable. Id.
In connection with the BankNewport Note, Jay Schochet (Schochet), General Partner of CIC-Newport, served as a guarantor, pledging a Certificate of Deposit to secure Lee's obligations.[9] Id. Lee has not made a payment on the BankNewport Note since March 2010.See Pl.'s Summ. J. Mem. Ex. P; Lee Dep. Tr. 77:5-78:6, June 10, 2010. As a result, CIC-Newport has been forced to make the appropriate payments to prevent a default on the BankNewport Note. See Henken Aff. ¶ 10. As of April 2010, the total principal due under the BankNewport Note was $72,882.14, plus interest accruing at a rate of 3.25%. Id. ¶ 11.
 Liquor License
According to Lee, in 2004, CIC-Newport acquired a Class BL Liquor License (Liquor License) for Sea Shai to use at the Restaurant.[10]See Lee Aff. ¶ 4. In connection with the acquisition, Lee, on behalf of Sea Shai, executed a Promissory Note (Liquor Note) dated September 1, 2004 setting forth a payment schedule for use of the Liquor License. See Pl.'s *Page 7 
Summ. J. Mem. Ex. R. The principal amount of the Liquor Note was $72,500 which was to be amortized over twenty-five years, payable every month until paid in full. Id. The Liquor Note provided that payments for the first twelve months would be $489.53 each, applied first to interest then principal. Thereafter, the interest rate was adjusted to prime plus 2% and the payment amounts were adjusted to properly amortize the Liquor Note. Id. The Liquor Note specified that it was secured by a security interest in the Liquor License under the terms of a security agreement (Security Agreement) executed concurrently and whose terms were incorporated therein. Id.
The Security Agreement secured "the payment and performance of [Sea Shai's] obligation under the [Liquor Note] dated September 1, 2004 as it may be amended, [and] any and all other indebtedness, liabilities, and obligations of [Sea Shai] to [CIC-Newport]. . . ." (Pl.'s Summ. J. Mem. Ex. Q.) Notably, the Security Agreement provided that
 "[a]t the expiration or termination of the [L]ease of the [Property] the [Liquor License] will be transferred by [Sea Shai] to CIC-Newport [], or its nominee, for the payment by [CIC-Newport] to [Sea Shai] of $10.00. Any unpaid balance on the [Liquor Note] at the time of transfer to CIC-Newport [] will be forgiven and the Security Agreement terminated."[11] Id.
Therefore, although the Liquor Note had a twenty-five year term, the Security Agreement contemplated a transfer of the license back to CIC-Newport upon the expiration of the ten-year Lease. Id.
CIC-Newport alleges that to date no payments were made by Sea Shai or any other *Page 8 
party as required under the Liquor Note for use of the Liquor License and that Sea Shai owes $72,500, plus interest. See Henken Aff. ¶¶ 15-16. On May 13, 2010, an Order was entered by this Court ordering that the Liquor License "be sold to a purchaser agreed to by the parties" and "[t]he monies obtained from the sale . . . be placed into an escrow account and held until further Order of this Court." (Pl.'s Summ. J. Mem. Ex. S.)
 II Standard of Review
Summary judgment is proper when, after reviewing the admissible evidence in the light most favorable to the non-moving party, "no genuine issue of material fact is evident from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and the motion justice finds that the moving party is entitled to prevail as a matter of law."Smiler v. Napolitano, 911 A.2d 1035, 1038 (R.I. 2006) (quoting Rule 56(c)). When considering a motion for summary judgment, "the court may not pass on the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Westinghouse Broad. Co.,Inc. v. Dial Media, Inc.,122 R.I. 571, 579, 410 A.2d 986, 990 (R.I. 1980) (internal citations omitted). During a summary judgment proceeding, "the justice's only function is to determine whether there are any issues involving material facts." Steinberg v. State,427 A.2d 338, 340 (R.I. 1981). Moreover, in passing upon a motion for summary judgment under Rule 56, if no genuine issue of material fact exists, the trial justice may determine "`whether the moving party is entitled to judgment under the applicable law.'" Ludwig v.Kowal, 419 A.2d 297, 301 (R.I. 1980) (quoting Belanger v.Silva, 114 R.I. 266, 267, 331 A.2d 403, 404 (1975)). "When there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment *Page 9 
is properly entered." Tangleridge Dev. Corp. v. Joslin,570 A.2d 1109, 1111 (R.I. 1990); Holliston Mills, Inc. v. CitizensTrust Co., 604 A.2d 331, 334 (R.I. 1992) (stating that "summary judgment is proper when there is no ambiguity as a matter of law").
 III Discussion A The Guaranties[12]
It is well settled that the requisites of contract formation apply generally to the formation of a contract creating a secondary obligation. See Restatement (Third)Surety Guaranty § 7 (1995). The essential elements of a contract are "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." Rhode IslandFive v. Medical Assocs. of Bristol Cnty., Inc.,668 A.2d 1250, 1253 (R.I. 1996) (internal citation omitted);see also Lamoureux v. Burrillville Racing Ass'n,91 R.I. 94, 98, 161 A.2d 213, 215 (1960)).
Generally, a promise to guaranty an obligation is valid and binding if it is "in writing and signed by the promisor and recites a purported consideration." Spittler v. Nicola,239 Neb. 972, 976, 479 N.W.2d 803, 807 (1992) (quoting Restatement (Second) Contracts § 88 (1981)); *Page 10 
Restatement (Third) Surety Guaranty § 9 (1995). It is well settled in Rhode Island that "consideration consists of some right, interest, or benefit accruing to one party and some forbearance, detriment, or responsibility given, suffered, or undertaken by the other." Hayes v. Plantations Steel Co.,438 A.2d 1091, 1094 (R.I. 1982). Although a valid guaranty must be supported by consideration, the guarantor need not receive a direct benefit. See Katz v. Prete, 459 A.2d 81, 86 (R.I. 1983) (noting that "[w]hen a corporate officer agrees to be liable for a debt of the corporation, it is not necessary for consideration to move to the officer personally. It is enough if the corporation receives the consideration.").
 1 Jung Kang Lee
Lee argues that summary judgment is inappropriate because issues of fact exist about the circumstances surrounding the execution of her personal guaranty. (Lee's Summ. J. Opp'n Mem. 3.) Specifically, Lee contends that the factual assertions in her affidavit could lead a trier of fact to find that she was induced to sign the personal guaranty through duress and coercion.[13] Id.
Although conflicting factual assertions exist as to the conditions under which Lee executed her guaranty, these disputed facts are immaterial, even when viewed in the proper light, and do not rise to a level of duress. The Rhode Island Supreme Court has defined duress as "a *Page 11 
condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party and causes the person to do an act . . . not of his or her own volition."Notarantonio v. Notarantonio, 941 A.2d 138, 147 (R.I. 2008) (quoting 25 Am. Jur. 2d Duress § 1 (2004)). It is "[a]n actual or a threatened violence or restraint of a man's [or woman's] person contrary to law, to compel him [or her] to enter into a contract or to discharge one." Peabody v. Tenney,18 R.I. 498, 502-03, 30 A. 456, 457-58 (1893). In fact, the compulsion by one party against another party to perform an act is not necessarily duress, and a threat against another to enter into a contract will not be considered duress unless the "threat excites a fear of some grievous wrong," such as death, great bodily injury, or unlawful imprisonment.Peabody, 18 R.I. at 503, 30 A. at 457-58.
Here, taking all of Lee's factual allegations as true, the Court finds as a matter of law that Koenig's alleged statements and actions are insufficient to rise to the level of duress.[14] While the Court acknowledges that Koenig's allegedly offensive or inappropriate conduct and comments may have "frightened" Lee and made her "anxious," Lee has failed to proffer any evidence that she was under threat of death, bodily harm, or unlawful imprisonment. Dalo v. Thalmann,878 A.2d 194, 197-98 (R.I. 2005) (declining to find duress where party failed to provide evidence of a wrongful act or threat sufficient to defeat her free will and cause her to sign the note). Although Koenig may have thrown the documents on the table and told Lee to sign them, and Lee may have chosen to sign them to get Koenig to leave, there is simply no *Page 12 
evidence (1) of actual or threatened violence or restraint, (2) that Lee could not have refused to sign the documents, or (3) that Lee was not acting of her own free will and accord.
Moreover, a contract created under duress is not automatically void, but rather voidable. McGee v. Stone, 522 A.2d 211, 214 (R.I. 1987) (citing Barnette v. Wells Fargo Nev. Nat'l Bank,270 U.S. 438 (1926)). "A party asserting duress must act promptly or be deemed to have affirmed the conduct in question." Id. (stating that party's failure to contest for eighteen months constituted waiver). Furthermore, "`[a] party who has received the benefit of the performance of a contract will not be permitted to deny his or her obligations unless paramount public interest requires it.'"Id. at 215 (quoting City of Warwick v. Boeng Corp.,472 A.2d 1214, 1218 (R.I. 1984)).
Here, even if the Court were to find evidence of duress, Lee's failure to promptly object to the documents results in a waiver of the defense. Although Lee claims that she did not know that she signed a personal guaranty, the Court finds that she had ample opportunity to subsequently contest the validity of the documents executed in Koenig's presence. Moreover, having failed to challenge the validity of the documents and consequently received the benefits of the Forbearance Agreement, Lee cannot now contest her guaranty when Plaintiff seeks to enforce it. As a result, the Court finds that Lee does not have a proper defense and is personally liable in accordance with the terms of her guaranty.
 2 Kyu Man Jeong
Similarly, Jeong contends that summary judgment is inappropriate because issues of material fact exist from which a trier of fact could deduce that his guaranty is unenforceable. See Jeong's Summ. J. Opp'n Mem. 1. Specifically, Jeong claims that his guaranty is unenforceable *Page 13 
because there was no mutual assent, a lack of consideration, and he was fraudulently induced to sign it by Lee's misrepresentations.Id. at 2-4.
Although Jeong alleges that factual disputes exist in connection with the execution of his personal guaranty, these disputed factual assertions are immaterial, even when viewed in the proper light. Jeong correctly asserts that an enforceable contract or guaranty "must be formed through mutual assent" which a court may analyze objectively.Filippi v. Filippi, 818 A.2d 608, 623 (R.I. 2003). In fact, objective intent is determined by the external interpretation of the parties' intent as manifested by their actions. Id. at 623-24.
Accordingly, it is well settled that "`a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents.'"Manchester v. Pereira, 926 A.2d 1005, 1012 (R.I. 2007) (quotingF.D. McKendall Lumber Co. v. Kalian,425 A.2d 515, 518 (R.I. 1981)); Fleet Nat'l Bank v.175 Post Rd., LLC, 851 A.2d 267, 275 (R.I. 2004). Despite Jeong's arguments that a dispute exists as to his assent to the guaranty, his execution of the guaranty is a clear manifestation of his mutual assent to be personally liable.
However, our Supreme Court has held that "if one is induced to enter into a contract based upon a fraudulent statement from the other party to the contract, then the party who has been fraudulently induced is not bound by the contract."[15] Bjartmarz v. Pinnacle Real Estate *Page 14 Tax Serv., 771 A.2d 124, 127 (R.I. 2001) (per curiam). "[A] party may invoke a claim of fraud in the inducement, even if he or she was negligent in failing to read the contract." Id. In such instances, "parol evidence is admissible in connection with proving a claim for fraud in the inducement of a contract." Id.
Nevertheless, Jeong may not assert fraud in the inducement as a defense against CIC-Newport's enforcement of his personal guaranty. Although a secondary obligation may be voidable based on a fraudulent or material misrepresentation by either the principal obligor or a third party, where, as here, CIC-Newport, in good faith, and without reason to know of the misrepresentation, granted a forbearance in reliance on the Guaranties, Jeong may not avoid his guaranty. See Restatement (Third) Suretyship Guaranty § 12 (1995); In reCommercial Money Ctr., Inc., No. 102CV16000, 2005 WL 2233233, *13 (N.D. Ohio Aug. 19, 2005) (quotingAmerican Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.,182 F.3d 1284, 1288 (11th Cir. 1999)) (stating that "[i]t is a basic principle of surety law that `fraud or misrepresentation practiced by the principal alone on the surety, without any knowledge or participation on the part of the creditor or obligee, in inducing the surety to enter into the suretyship contract will not affect the liability of the surety'"); New Jersey Econ. Dev. Auth. v. PavoniaRest., Inc.,319 N.J. Super. 435, 447-48, 25 A.2d 1133, 1140 (N.J. Super. 1998);Lewin v. Anselmo, 56 Cal. App. 4th 694, 701 (Cal. Ct. App. 1997);compare with Rachman Bag Co. v. Liberty Mut. Ins. Co.,839 F. Supp. 998, 1003 (E.D.N.Y. 1993) (holding that the surety could assert the defense of fraudulent concealment against the obligee who had good reason to believe that the surety was being deceived).
Likewise, no genuine issues of material fact exist from which a trier of fact could find that Jeong's guaranty fails for lack of consideration. Although Jeong's guaranty must be *Page 15 
supported by consideration, Jeong, as Sea Shai's Vice President, need not have received a direct benefit for it to be valid. SeePrete, 459 A.2d at 86. Rather, as a result of Sea Shai's direct benefit from the Forbearance Agreement, the Court finds that Jeong's guaranty of Sea Shai's Lease obligations was supported by sufficient consideration. Id.
Moreover, it is well settled that instruments made in reference to, and as a part of, a transaction should be considered and construed together. Northland Mortg. Co. v. Royalwood Estates, Inc.,190 Neb. 46, 48, 206 N.W.2d 328, 330 (1973). It is not important that the instruments were made or dated at different times if they are related to and were a part of the transaction. Id.; RycoPackaging Corp. of Kansas v. Chapelle Int'l, Ltd.,23 Kan. App. 2d 30, 36-37, 926 P.2d 669, 674 (1996) (stating that when a guaranty agreement is executed at or about the same time as the underlying transaction between the creditor and debtor, the guaranty is read in conjunction with the underlying documents); 38 Am. Jur. 2d Guaranty § 30 (2010) (stating that as long as the guaranty "was given as part of the same transaction or arrangement that created the underlying obligation. . . . [t]he two documents need not be executed on the same date").
Here, the express language of Jeong's guaranty stated that "[i]t [was] a condition of the execution and delivery by [CIC-Newport] of the Forbearance Agreement that the Guarantor [Jeong] execute and deliver this Guaranty." (Pl.'s Summ. J. Mem. Ex. F.) Although Jeong's guaranty and the Forbearance Agreement may not have been executed at the same time, the Court finds that they were part of the same transaction, and that CIC-Newport's forbearance — as contemplated by the Forbearance Agreement — was sufficient consideration for Jeong's guaranty.See Liberty Nat. Bank v. Gross,201 A.D.2d 467, 468 (N.Y. App. Div. 1994); First Commerce Bank v.Palmer, 226 S.W.3d 396, 398 (Tex. 2007) (quoting 38 Am. Jur. 2d Guaranty § 31 (2010)) *Page 16 
(stating that even when the guaranty is signed after the principal obligation, "`the guaranty is founded on consideration if it was given as the result of previous arrangement, or the principal obligation was induced by or created on the faith of the guaranty'").
Therefore, without any valid factual assertions in the pleadings or affidavits that would vitiate defendant's objective manifestation of assent or the sufficiency of consideration, the Court finds that no trier of fact could reasonably find Jeong's guaranty unenforceable.See Westerly Hosp. v. Higgins,106 R.I. 155, 161, 256 A.2d 506, 510 (R.I. 1969). Consequently, the Court finds that Plaintiff's claim is ripe for summary judgment as a matter of law and that Jeong is personally liable in accordance with the terms of his guaranty.
 B BankNewport Promissory Note
Although a motion to dismiss is not currently pending before this Court, during oral argument held before the Court in connection with the parties' summary judgment motions, Lee's attorney asserted that summary judgment should not be granted with regards to the BankNewport Note because Plaintiff's claim was not sufficiently pleaded. The Court, however, disagrees.
Under Rhode Island's notice pleading standard, "[a]ll that is required is that a complaint give the opposing party fair and adequate notice of the type of claim being asserted." Haley v. Town of Lincoln,611 A.2d 845, 848 (R.I. 1992). In order to set forth a valid claim for relief, a party is merely required to set forth "(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks." Super. R. Civ. P. 8(a). Here, Plaintiff's Complaint clearly sets forth a short statement of its claim and the relief sought in connection with the BankNewport Note. See Complaint ¶¶ 22 52. *Page 17 
Moreover, as no genuine issue of material fact exists in connection with the BankNewport Note, the Court finds that Plaintiff's claim is ripe for summary judgment. Under the terms of the BankNewport Note, Schochet served as a guarantor, pledging a Certificate of Deposit to secure Lee's obligation. Where, as here, CIC-Newport — after assuming Schochet's rights, claims, and interests in the BankNewport Note as a result of the Assignment — made payments to prevent a default under the BankNewport Note, the Court finds that CIC-Newport is entitled to reimbursement by Lee. See Restatement (Third)Surety Guaranty § 22 (1995) (stating that "when the principal obligor [Lee] is charged with the notice[16] of the secondary obligation it is the duty of the principal obligor to reimburse the secondary obligor [CIC-Newport] to the extent that the secondary obligor . . . performs the secondary obligation"). Therefore, in light of Plaintiff's undisputed assertion that Lee does not intend to pay her obligations under the BankNewport Note, the Court finds that CIC-Newport is entitled to the total amount due to satisfy the BankNewport Note, including interest.
 C Liquor License[17]
It is well settled in Rhode Island that parties may not enter into contracts in contravention of a state statute. Vose v. Rhode IslandBhd. of Corr. Officers, 587 A.2d 913, 915 (R.I. 1991); Power v.Providence, 582 A.2d 895, 900 (R.I. 1990). Such contracts are illegal and no contract *Page 18 
rights are thereby created. Id. (citing Birkett v.Chatterton, 13 R.I. 299, 302 (1881)); Chambers v. Church,14 R.I. 398, 401 (R.I. 1884) (noting that "[i]t is well settled that when a contract is illegal and prohibited by law[,] no action can be maintained upon it in law or equity, either to enforce its obligations or to secure its fruits to either party").
Under the General Laws of Rhode Island, "[t]he holder of a license issued pursuant to this title shall not assign, rent, lease or let the license but may transfer his or her interest only as provided in § 3-5-19." G.L. 1956 § 3-5-29. Specifically, only "[t]he board, body or official which has issued any license under this title may permit the license to be used at any other place within the limits of the town or city where the license was granted, or, in their discretion, permit the license to be transferred to another person. . . ." Sec. 3-5-19.
Here, following the expiration of the Lease, the Security Agreement clearly and unambiguously contemplated that the Liquor License would be transferred back to CIC-Newport for a nominal payment of $10.00 and the unpaid balance of the Liquor Note would be forgiven. See Pl.'s Summ. J. Mem. Ex. Q. The Court finds as a matter of law that the execution of the Security Agreement and Liquor Note was an illegal attempt to lease the Liquor License to Sea Shai in contravention of § 3-5-29, and is therefore, unenforceable.[18]
In light of the fact that the transfer of the Liquor License to Sea Shai was approved by the Newport City Council in accordance with § 3-5-19, the Court finds as a matter of law that the Liquor License was owned by Sea Shai. However, the proceeds from the sale of the Liquor *Page 19 
License, currently held in escrow in accordance with this Court's previous Order, shall be paid to CIC-Newport to satisfy a portion of Sea Shai's outstanding debt.
 D Attorneys' Fees
It is well settled in Rhode Island that under the "American Rule," litigants are generally required to pay their own attorneys' fees, absent statutory authority or contractual liability. Moore v.Ballard, 914 A.2d 487, 489 (R.I. 2007) (citing Eleazer v. Ted ReedThermal, Inc., 576 A.2d 1217, 1221 (R.I. 1990)). This rule, however, is not without exception. See Blue Cross Blue Shieldof R.I. v. Najarian, 911 A.2d 706, 711 n. 5 (R.I. 2006) (citingChambers v. NASCO, Inc.,501 U.S. 32, 45, 111 S. Ct. 2123, 2133 (1991)) (stating three specific circumstances courts have granted an exception: (1) pursuant to the "common fund exception," a court may award attorneys' fees to the party whose litigation efforts directly benefited others; (2) a court may also assess attorneys' fees as a sanction for willful disobedience of a court order; and (3) a court may award attorneys' fees when a party has acted in bad faith or for oppressive reasons); see alsoVincent v. Musone, 574 A.2d 1234, 1235 (1990) (affirming the Court's inherent power to fashion appropriate remedies that "serve the ends of justice"). These exceptions are inapplicable to the instant matter.
Here, however, the Court finds that the Defendants have clear contractual liability for attorneys' fees, costs, and expenses. In particular, the Lease provided that if CIC-Newport made
 "any expenditures or incur[red] any obligations for the payment of money in connection therewith, including but not limited to reasonable attorneys' fees, in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations incurred shall be paid to CIC-Newport by Sea Shai as additional rent (notwithstanding that the term of this Lease may have ended)." (Pl.'s Summ. J. Mem. Ex. A.) *Page 20 
Moreover, the Guaranties stated that the "Guarantor [Lee or Jeong] will reimburse [CIC-Newport] for all expenses, including without limitation reasonable attorneys' fees, incurred in connection with the enforcement of this Guaranty by [CIC-Newport]." Id. at Ex. F. Similarly, the Amended Consent Judgment provided that
 "[i]n the event that [CIC-Newport] must take any action to enforce this Judgment and/or enforce any of the terms hereof, Plaintiff shall be entitled to collect any and all expenses including reasonable attorneys' fees, interest from the date of the entry of this Judgment and costs in conjunction with any such action to enforce this Judgment." Id. at Ex. J.
Therefore, in light of the Court determinations contained herein, and the language contained in the Lease, Guaranties, and Amended Consent Judgment, the Court finds that Plaintiff is entitled to the reasonable attorneys' fees, costs, and expenses incurred as a result of the enforcement of its rights under these documents.
 IV Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at the hearing and in their memoranda, the Court finds that there exists no genuine issue of material fact or ambiguity of law for this Court to determine. As a result, the Court finds Defendants are liable for breach of both the Lease and Forbearance Agreement. In light of the Court's determination that the Guaranties are valid and binding, Lee and Jeong are jointly and severally liable for Sea Shai's obligations under the Lease and Forbearance Agreement, or $102,333.49. Furthermore, the Court finds that CIC-Newport is entitled to reimbursement by Lee for the balance due under the BankNewport Note, including interest. Although the Court finds that the Liquor License was properly transferred to and owned by Sea Shai, CIC-Newport is entitled to the sale proceeds currently being held in escrow as an offset of the debt currently *Page 21 
owed by Sea Shai. Moreover, the Court finds that Plaintiff is entitled to the reasonable attorneys' fees, costs, and expenses incurred as a result of the enforcement of the Lease, Forbearance Agreement, and Amended Consent Judgment.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] Richard Henken is the Manager of CIC-Newport. See Henken Aff. ¶ 1.
[2] Lee signed the Lease as President of Sea Shai and Jeong signed as its Vice President. See Pl.'s Summ. J. Mem. Ex. A. During the Lease negotiations, CIC-Newport sought personal guaranties from Lee and Jeong, however, at the advice of counsel, they refused. See Jeong Dep. Tr. 52:2-23. Notably, the Lease provided that Sea Shai was required to pay, as additional rent, all costs and attorneys' fees incurred in connection with the enforcement of the Lease. Id.
[3] Under the Forbearance Agreement, Sea Shai was permitted to continue its occupancy of the Property in accordance with the Lease and was required to "perform and observe all covenants and conditions of the Lease . . . and forthwith cure any outstanding breach with respect thereto." (Pl.'s Summ. J. Mem. Ex. C.) In addition to paying the Arrearages, Sea Shai agreed to "cause [Lee] to punctually pay in full all principal, interest and other sums due from time to time to BankNewport pursuant to the provisions of a Promissory Note dated August 31, 2007." Id.
[4] Jeong claims that he neither saw nor reviewed a copy of the Forbearance Agreement before the commencement of the instant litigation.See Jeong Dep. Tr. 32:10-12, May 3, 2010.
[5] According to Lee, in early March 2008, Marc Koenig (Koenig), a real estate consultant employed by CIC-Newport, began calling her and "screaming" at her to pay the rent. See Lee Aff. ¶ 6. Lee claims that during his visits to the Restaurant, Koenig's statements and actions "shocked and frightened" her. Id. She alleges that during a meeting at the Restaurant on March 28, 2008, Koenig "frightened" and "intimidated" her and "threw some papers on the table" for her to sign "right there and then." Id. ¶ 7. Lee avers that she was so "frightened" and "anxious" that she signed the papers without reading them to get Koenig to leave, and therefore, "had no idea that one of the documents . . . would make [her] personally responsible for Sea Shai's obligations." Id. In contrast, Koenig claims that he met with Lee on two occasions in connection with the Guaranties and Forbearance Agreement. See Koenig Aff. ¶¶ 4-6; Koenig Dep. Tr. 58:1-60:23, July 2, 2010. Koenig asserts that at his first meeting with Lee in March 2008, he delivered the Guaranties and Forbearance Agreement and advised her to consult her attorney and to call him when the documents were ready. Id. Furthermore, Koenig alleges that when he and Lee spoke about a week later, she told him she had seen her attorney, spoken with Jeong, and that everything would be ready when he arrived. See Koenig Dep. Tr. 62:6-63:1, July 2, 2010. Upon his arrival, Koenig claims that Jeong's guaranty had already been signed, and that he witnessed Lee sign her documents. Id. at 66:22-68:8.
[6] Notably, Jeong alleges that he never read the personal guaranty before signing it at the Restaurant on March 31, 2008. See Jeong Dep. Tr. 33:12-18, May 3, 2010. According to Jeong, he neither had an attorney review the guaranty nor understood that he was signing a personal guaranty because of misrepresentations made by Lee.Id. at 33:19-34:4, 35:11-21. 36:17-37:17. In contrast, Koenig alleges that he "spoke with [Jeong] prior to the delivery of and the execution of the [Guaranties] and Forbearance Agreement." See
Jeong's Summ. J. Opp'n Mem. Ex. E. According to Koenig, he called Jeong "to inform him that Sea Shai's rental payments were in arrears and documents were going to be delivered that required his review and he should speak with his partner, Mrs. Lee about them." Id.
[7] Plaintiff's damages calculation reflects the balance of the total accrued rent and late fees for the period of the Lease prior to re-taking possession of the Property up until its re-rental in August 2010, after accounting for the proceeds from the Sheriff's sale.See Henken Aff. ¶¶ 2-3; Pl.'s Summ. J. Mem. Exs. E L. The Court notes that under the Lease, Sea Shai was required to pay a late fee equal to 2% of the amounts owed to CIC-Newport. (Pl.'s Summ. J. Mem. Ex. A.)
[8] Plaintiff alleges that it used its best and most diligent efforts to re-rent the Property and mitigate the damages it has suffered.See Henken Aff. ¶ 7.
[9] Schochet subsequently assigned all his rights under the BankNewport Note to CIC-Newport (Assignment). See Pl.'s Summ. J. Mem. Ex. O. The Assignment entitled CIC-Newport to "pursue all claims against [Lee] that [Schochet] had as Guarantor including but not limited to those claims against [Lee] as a result of her default under the BankNewport [] Note." Id.
[10] Notably, the Liquor License was transferred to Sea Shai after Lee went before the Newport City Council — pursuant to G.L. 1956 § 3-5-19 — and obtained its approval for the transfer. See Lee Aff. ¶ 4. Additionally, Lee claims that Schochet told her that he had purchased the Liquor License for her. See Lee Dep. Tr. 80:12-81:20, 90:1-91:10, June 10, 2010.
[11] Additionally, Sea Shai was required to pay CIC-Newport for
 "any and all expenses, including all reasonable attorney's fees, legal expenses, incurred or paid by Secured Party in protecting or enforcing its rights, powers, and remedies hereunder or under any other agreement between the parties or any note secured hereby or thereby or in any way connected with any proceeding or action by whomsoever initiated concerning the protection or enforcement thereof." (Pl.'s Summ. J. Mem. Ex. Q.)
[12] As a threshold matter, to determine whether liability exists under the Guaranties, the Court must first address whether a breach of either the Lease or Forbearance Agreement has occurred. In order to establish a breach of contract claim, a party must provide evidence that there has been a "violation of a contractual obligation, either by failing to perform one's promise or by interfering with another party's performance." Demicco v. Medical Assocs. of R.I., Inc., No. 99-251L, 2000 WL 1146532, *2 (D.R.I. 2000). Here, however, the Court notes that Defendants do not dispute that they breached both the Lease and Forbearance Agreement by failing to make the appropriate rental payments. See e.g., Lee Dep. Tr. 62:7-63:9, 92:20-93:7, June 10, 2010; Pl.'s Summ. J. Mem. Ex. E. Therefore, where, as here, there are no disputed material issues of fact, the Court finds as a matter of law that the Defendants breached both the Lease and Forbearance Agreement and will now address Lee and Jeong's liability under the Guaranties.
[13] As an aside, although the Court acknowledges that the Defendants failed to raise their arguments as affirmative defenses in accordance with Super. R. Civ. P. 8(c), our Supreme Court has affirmed that "[t]here is no requirement that an affirmative defense be specifically labeled as such, and the defense `may be pleaded in general so long as it gives the plaintiff fair notice of the defense.'"Tucker v. Mammoth Mart, Inc., 446 A.2d 760, 762 (R.I. 1982) (quoting 1 Kent, R.I. Civ. Prac. § 8.6 at 87 (1969));see also Industrial Nat'l Bank v. Peloso,121 R.I. 305, 308, 397 A.2d 1312, 1313 (1979) (affirming that a court may consider an unpleaded affirmative defense on a motion for summary judgment).
[14] Additionally, Lee's factual allegations, viewed in their entirety and in the proper light, are insufficient given the heightened burden of proof required for a claim of duress in a contractual setting.See 25 Am. Jur. 2d Duress UndueInfluence § 34 (2004) (stating that if duress is relied upon as a defense or ground for avoiding a contract, it must be proven by clear and convincing evidence); Passarelli v. Passarelli,94 R.I. 157, 160, 179 A.2d 330, 332 (R.I. 1962).
[15] Fraud in the inducement is defined as "[m]isrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken." Bourdon's v. Ecin Indus.,Inc., 704 A.2d 747, 753 (R.I. 1997) (citingBlack's Law Dictionary 661 (6th ed. 1990)). To prevail on a claim of fraud in the inducement, a party must establish: "(1) A false representation . . . (2) Knowledge of the statement's falsity . . . (3) Intent to induce reliance . . . [and] (4) [D]etrimental reliance." Women's Dev. Corp. v. City of Cent. Falls,764 A.2d 151, 161 (R.I. 2001).
[16] Under the Restatement, "[a] principal obligor is charged with notice of a secondary obligation if the principal obligor is a party to the contract creating the secondary obligation. . . ." Restatement (Third) Surety Guaranty § 20 (1995). The Court finds that Lee as principal obligor was on notice of Schochet's obligation as secondary obligor, because both Lee and Schochet were parties to the BankNewport Note.
[17] After reviewing the evidence proffered by the parties in a light most favorable to the Defendants, the Court finds that no genuine issues of material fact or ambiguities of law exist in connection with the transfer of the Liquor License. Therefore, the Court believes that Plaintiff's claim is ripe for summary judgment as a matter of law.
[18] It has long been a general rule in this jurisdiction that instruments executed "`at the same time, for the same purpose and in the course of the same transaction . . . are to be considered as one instrument and are to be read and construed together.'" Rotelli v.Catanzaro, 686 A.2d 91, 94 (R.I. 1996) (quoting Old KentuckyDistrib. Corp. v. Morin, 50 R.I. 163, 165, 146 A. 403, 404 (1929));see also Maderios v. Savino,418 A.2d 839, 842 (R.I. 1980) (stating that promissory notes executed as part of single transaction should be construed together to determine the mutual rights and obligations of the parties).